965 So.2d 511 (2007)
Joseph GREFER, Camille Grefer, Rose Marie Grefer, Hassi and Henry Grefer
v.
ALPHA TECHNICAL, et al.
No. 2002-CA-1237.
Court of Appeal of Louisiana, Fourth Circuit.
August 8, 2007.
*513 Andrew B. Sacks, John K. Weston, Law Offices of Andrew B. Sacks and Associates, Jenkintown, PA, Stuart H. Smith, Michael G. Stag, Smith & Stag, L.L.C., Stephen B. Murray, Arthur M. Murray, Murray Law Firm, New Orleans, LA, Ron A. Austin, Austin & Associates, L.L.C., Harvey, LA, Jack W. Harang, Harang & Barker, L.L.C., Metairie, LA, Ralph R. Alexis III, Porteous, Hainkel & Johnson, LLP, New Orleans, LA, for Plaintiffs, Joseph Grefer, et al.
Glen M. Pilié, Ronald J. Sholes, Louis C. Lacour, Jr., Martin A. Stern, Adams And Reese LLP, New Orleans, LA, for Appellants, Exxon Mobil Corporation.
(Court composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
The Supreme Court of the United States ("U.S. Supreme Court") vacated our judgment previously rendered in Grefer v. Alpha Technical, XXXX-XXXX (La.App. 4 Cir. 3/31/05), 901 So.2d 1117, and remanded the matter for our further consideration in light of its decision in Philip Morris USA v. Williams, 549 U.S. ___, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007).[1]

*514 Factual Summary and Procedural History
The plaintiffs, Joseph Grefer, Camille Grefer, Rose Marie Grefer Haase and Henry Grefer ("the Grefers"), filed suit in August of 1997 against the defendants, Exxon Mobil Corporation ("Exxon") and Intracoastal Tubular Services, Inc. ("ITCO"), among others, to recover damages for the contamination of a 33-acre tract of land with radioactive material.[2] Between 1968 and 1992, ITCO, an oil field service company, had leased the land from Mrs. Camille Grefer for its business operations, which included the cleaning, inspecting, testing, threading, transporting and storage of oil well tubulars (pipe) for Exxon and other oil companies.
The Grefers asserted causes of action in negligence, strict liability, absolute liability, nuisance, fraud, and breach of contract. They sought compensatory damages for the loss of use and remediation of the property as well as punitive damages pursuant to La. C.C. art. 2315.3.[3] After a five-week trial, the jury returned a verdict in favor of the Grefers and awarded them compensatory damages in the amount of $56,145,000.00, which included $145,000.00 in general damages and $56,000,000.00 in restoration costs (special damages), as well as exemplary (punitive) damages in the amount of one billion dollars. The jury allocated 85% of the fault to Exxon, 5% to ITCO, and 10% to two absent defendants. The jury also found that "ITCO [was] entitled to recover from Exxon all amounts awarded against ITCO under its counterclaim against Exxon[.]" After the trial court held a separate hearing to consider the merits of an exception of prescription filed by Exxon, the trial judge rendered a judgment denying the exception and a judgment in accord with the jury's verdict. Exxon, ITCO and the Grefers appealed. On appeal, we amended the judgment reducing the one billion dollar punitive award to $112,290,000.00, an amount equal to twice the compensatory award, and affirmed the judgments in all other respects. See Grefer, supra. The Grefers and Exxon applied for Writs of Certiorari to the Louisiana Supreme Court, which were denied.[4]
Exxon subsequently filed motions to stay the execution of the judgment with both the Louisiana Supreme Court and the U.S. Supreme Court, which were denied.
Thereafter, Exxon applied to the U.S. Supreme Court for a Writ of Certiorari, which the Court granted, vacating our decision and remanding the matter for further consideration. See n. 1, infra.

The Philip Morris case
In Philip Morris, the U.S. Supreme Court vacated the decision of the Oregon *515 Supreme Court that had upheld an award of punitive damages against Philip Morris. The U.S. Supreme Court found that although a plaintiff who seeks punitive damages may show harm to others who are nonparties to the litigation as a means of demonstrating the reprehensible nature of the defendant's conduct, a jury may not use punitive damages to punish a defendant "directly on account of harms it is alleged to have visited on nonparties." Philip Morris, 549 U.S. at ___, 127 S.Ct. at 1064. The Court additionally found that the Due Process Clause of the United States Constitution requires that the States make assurances that juries are not basing punitive damage awards on improper precepts. That is, although a jury may consider the reprehensibility of the defendant's conduct in determining that punitive damages are warranted, it may not consider and ultimately punish a defendant for the harm caused to those who are not parties to the litigation.
The Philip Morris case arose out of the death of Jesse D. Williams, a heavy cigarette smoker. The plaintiff, Mr. Williams' widow, Mrs. Mayola Williams, represented his estate in the lawsuit filed in Oregon state court against Philip Morris, the manufacturer of Marlboro, the decedent's favorite brand of cigarette. The plaintiff sought compensatory and punitive damages against Philip Morris.
At the conclusion of the trial, Philip Morris had requested that the trial court give to the jury an instruction with regard to punitive damages. The requested instruction prohibited the jury from making an award of punitive damages for the impact of the defendant's alleged misconduct on other persons who may bring their own lawsuits in which juries can resolve their claims and award punitive damages for those harms as such juries see fit. The trial court refused to give the instruction and Philip Morris objected. This was the sole basis upon which the U.S. Supreme Court granted Philip Morris' writ application. We are to now consider the Philip Morris decision in resolving Grefer as the U.S. Supreme Court directed.

The jury instructions in Grefer

At the trial in Grefer, Exxon proposed two jury instructions with respect to exemplary damages. The first, Exxon's Proposed Instruction 17, reads as follows:
EXEMPLARY DAMAGES  GENERALLY
In this particular case, Louisiana law permits you to consider an additional element of damages called exemplary damages (or called "punitive damages" in other states).
You may only award exemplary damages if the plaintiffs prove, by a preponderance of the evidence, that:
(1) the defendant's conduct was wanton and reckless;
(2) the danger created by the defendant's wanton and reckless conduct threatened or endangered public safety;
(3) the defendant's wanton and reckless conduct occurred in the storage, handling, or transportation of hazardous or toxic substances; and
(4) the plaintiffs' damages were caused by the defendant's wanton and reckless conduct.
The phrase "wanton and reckless" means a conscious indifference to consequences, amounting almost to a willingness that harm to the public safety would follow. Stated another way, wanton and reckless conduct is that which amounts to intentional and deliberate action that has the character of outrage frequently associated with crime.

*516 Unless you find that the defendant acted with almost a willingness that harm to the public safety would follow, then you may not award exemplary damages.
Even if you decide that the plaintiffs are entitled to exemplary damages, you may not award such damages for conduct that the defendants engaged in before 1984 or after 1996. Under Louisiana law, the plaintiffs are not entitled to exemplary damages for conduct that the defendants engaged in before 1984 or after 1996. [footnote omitted]
The second instruction, Exxon's Proposed Instruction 18, states,
EXEMPLARY DAMAGES  DISCRETIONARY
Exemplary damages are within your discretion. This means that even if you find that the defendants' conduct was wanton or reckless, you are not required to award exemplary damages to the plaintiffs. [footnote omitted]
The trial judge rejected the aforementioned instructions proposed by Exxon and instructed the jury on exemplary damages as follows:[5]
(1) Under our law, in addition to the award of damages to compensate a plaintiff for the injuries suffered, you may award exemplary damages against a defendant when the plaintiff shows that the defendants were wanton or reckless in their disregard for public safety in the storage, handling or transport of hazardous or toxic substances.
(2) For the purposes of awarding exemplary damages, "wanton" and "reckless" mean something more than mere negligence. The defendant must have known that public safety was at risk or should have known it was highly probable that harm to the public would result from his conduct. In other words, in order to find "wanton" or "reckless" conduct, a plaintiff must prove the defendant's alleged acts and omissions of negligence were accompanied by a conscious indifference to consequences amounting almost to a willingness that harm to the public safety would follow.
(3) Exemplary damages are regarded as a fine or penalty for the protection of the public interest. Such damages are given to the plaintiff over and above the full compensation for the plaintiff's losses for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example. Exemplary damages are not awarded to benefit the injured party but to compel the wrongdoer to have due and proper regard for the rights of the public. You should award an amount of exemplary damages which you feel will be reasonably likely to accomplish that purpose in this case.
(4) Another factor you may consider in determining the amount of exemplary damage award is the nature and the extent of the harm to the plaintiffs. You may also consider each defendant's financial position when determining the amount of exemplary damages to be awarded because the award is meant to be meaningful enough to actually deter wrongful conduct.
(5) Even if you decide that the plaintiffs are entitled to exemplary damages, you may not award such damages for conduct that the defendants engaged in before 1984 or after 1996.
(6) Exemplary damages are within your discretion. This means if you find that the defendant's conduct was wanton *517 or reckless, you are not required to award exemplary damages to the plaintiffs.

Discussion
The trier of fact may consider the following factors in awarding exemplary damages: (1) the nature and extent of the harm to the plaintiff; (2) the reprehensibility of the defendant's conduct; (3) the wealth or financial position of the defendant; (4) the imposition of punishment on the defendant; (5) the deterrent effect, i.e. whether it will deter future or similar conduct by the defendant and others. See Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 439, n. 12, 121 S.Ct. 1678, 1688, n. 12, 149 L.Ed.2d 674 (2001); Restatement (Second) of Torts § 908, Comment e (1979).
In instructing the jury with respect to whether exemplary damages should be awarded to the Grefers, the trial judge set forth a correct statement of the law. The trial judge referred to harm or the potential (risk of) harm to nonparties resulting from the defendant's conduct when she referred to the public safety in her explanation of "wanton" and "reckless" conduct. As the reprehensible nature of the defendant's conduct is a factor which the jury may consider in deciding whether exemplary damages are warranted and, if so, the amount that should be awarded, this instruction was permissible under the standards set forth by the U.S. Supreme Court in Philip Morris (a plaintiff may show harm to others in order to demonstrate reprehensibility).
The trial judge's only other reference to nonparties occurred when she instructed the jury that exemplary damages were awarded not to benefit the plaintiff but to punish the defendant, to compel the defendant to have "proper regard for the rights of the public," and to deter others from following the defendant's example. The U.S. Supreme Court has found no constitutional violation in imposing punitive damages "to further a State's legitimate interest in punishing unlawful conduct and deterring its repetition." Philip Morris, 549 U.S. at ___, 127 S.Ct. at 1062, citing BMW of North America, Inc., v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Thus, the trial court's reference to nonparties within the context of the public's interest and safety did not violate the defendant's rights to due process.
Essentially, paragraphs two and three of the trial judge's instructions on exemplary damages explained reprehensibility, i.e. "wanton" and "reckless" conduct as well as informed the jury that the award should punish the defendant and deter similar conduct. All three of these factors are permissible under the standards set forth by the U.S. Supreme Court and the courts of this state.
Lastly, in paragraphs four, five and six, the trial judge charged the jury that they were to consider the harm done to the plaintiff, the defendant's financial condition, the time periods for which exemplary damages were to apply, and that an award for such damages was solely within their discretion. None of these factors is objectionable or prohibited.
When we consider the totality of the trial court's jury instructions on exemplary damages, we find they are both permissible and constitutional. Moreover, even though the record does not include the objections made by Exxon to the instructions during the jury charge conference, two facts should be noted. First, unlike the defendant in Philip Morris, Exxon raised no assignment of error on appeal as to either the trial court's jury instructions or to the trial court's refusal to give Exxon's *518 proposed jury instructions. Second, for all intents and purposes, the trial court's instructions tracked almost verbatim Exxon's proposed instructions. Thus, we find the trial court's jury instructions herein pass constitutional muster.
The question we are ultimately asked to decide is whether Exxon received a fair trial. In other words, in light of Philip Morris, was Exxon afforded all of the constitutional protections available under the Due Process Clause of the U.S. Constitution? We answer this "yes."

Exxon's Wanton and Reckless Conduct
Exxon argued in the first appeal that the jury's award of exemplary damages must be vacated because the record does not support a finding that Exxon engaged in wanton and reckless conduct as required under La. C.C. art. 2315.3.
The statute providing for exemplary damages for wanton and reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances must be strictly construed, as it imposes a penalty. Bonnette v. Conoco, Inc., 2001-2767, p. 27 (La.1/28/03), 837 So.2d 1219, 1236-37. To obtain an award of exemplary or punitive damages under La. C.C. art. 2315.3, the plaintiff must prove: (1) that the defendant's conduct was wanton and reckless by proving that "the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position," or that the defendant engaged in "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent;" (2) that the danger created by the defendant's wanton or reckless conduct threatened or endangered public safety; (3) that the defendant's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) that the plaintiff's injury was caused by the defendant's wanton or reckless conduct. Id.; Billiot v. B.P. Oil., Co., 93-1118, pp. 16-17 (La.9/29/94), 645 So.2d 604, 613.
As set forth in our prior opinion, our review of the record disclosed sufficient evidence to support the jury's finding that Exxon had engaged in wanton and reckless conduct. Exxon first learned of NORM[6] contamination in oilfield drilling equipment in 1981, when Occidental Petroleum, another oil company, discovered it on its platforms in the North Sea. At that time, Dr. Andrew Lloyd Smith, a Scottish environmental consultant, was working for Occidental Petroleum in the U.K., and following the discovery, was a member of the United Kingdom Offshore Operators Association (UKOOA) Safety Committee that drafted and published the UKOOA safety guidelines and Reference Manual that were given to all oil companies operating in the North Sea. ITCO offered Dr. Smith as a health and safety expert witness at trial. According to Dr. Smith, the reference manual was extensive and covered both the identification of radioactive scale and the procedure to follow up on such identification. The guidelines, promulgated by the oil and gas industry and approved by the U.K.'s National Radiological Protection Board ("NRPB"), recommended the specific steps to minimize or eliminate the effect of NORM on public health and the environment.
Though Exxon was abreast of the problem, it took no action to survey its wells elsewhere. The depositions of Mr. John Rullman, Director of Exxon's Eastern Division Environmental and Regulatory Affairs, and of Mr. Everett C. Hutchinson, *519 Exxon's Assistant Director of Environmental and Regulatory Affairs, were introduced into evidence and read to the jury at trial. Mr. Rullman testified that he had obtained a copy of the UKOOA safety guidelines and found they were very onerous, restrictive, and inflexible. He also admitted that he was not sure if at that time Exxon had the same problem in the U.S. Mr. Hutchinson, too, believed the UKOOA guidelines were unreasonable for Exxon's production operations in the U.S. Mr. Booher, Exxon's industrial hygienist, admitted that if Exxon had surveyed its wells prior to the Chevron discovery in the U.S. in 1986, then it would have discovered radium in its wellheads much sooner.[7]
In May 1986, after learning of Chevron's NORM discovery in Mississippi, Exxon surveyed its Mississippi well sites and found radiation accumulation in its equipment. Twice Exxon officials were notified that the cleaning contractors had to be informed of the radioactivity, as it posed a health and safety hazard, but they still did nothing to warn them.
The evidence further disclosed that by August 1986 Exxon was clearly worried about governmental regulation and losing the produced water exemption, which allowed it to dispose of the by-product in an unregulated manner. A memo written on August 28, 1986, by Mr. Howard Collier, Exxon's director of Environmental and Regulatory Affairs, stated, "Chevron has taken a very high profile approach to handling their discovery of radiation in Mississippi and many agencies are now involved." Mr. Collier expressed an interest in "[getting] the industry and the regulatory agencies to slow down." Then he admitted,
Chevron's discovery is nothing new. After all, if there wasn't some radiation in down-hole formations, it would be difficult to run a gamma ray log. My primary concern is the current investigation and analysis not unduly influence the EPA who is in the process of deciding under RCRA [Resource Conservation Recovery Act] whether produced water should be classified as a hazardous waste and handled as such.
Mr. Booher's notes taken from comments made by Mr. Collier at an Exxon NORM meeting in Houston on January 8, 1987, indicate the cost of losing the RCRA exemption for produced water as $750 million in the first year and $150 million for each year thereafter. At that same meeting, several Exxon officials concluded that notifying the cleaning contractors would be "premature."
The evidence also disclosed that Exxon was concerned about litigation arising from the NORM discovery in Mississippi. Street, Inc., a pipe yard company in Mississippi, had filed suit against Chevron and other oil companies (not Exxon), for $35 million, claiming negligence for failure to advise that pipe delivered to it was contaminated with radioactive material. Mr. Hutchinson, in an internal memo copied to Mr. Rullman, recognized the possible "need to manage the disposal of large accumulations of contaminated scale, such as could occur at a pipe yard." Mr. Rullman, in a confidential memo dated October 14, 1986, noted ITCO was a potential "look alike" to Street, Inc., and stated, "If potential exists for radioactive material accumulation, perform low key radiation exposure measurements;" "Coordinate ITCO plan with Eastern Division;" and "Consider advisory letter to ITCO with Headquarters *520 involvement." Still, Exxon did nothing to notify ITCO.
Eventually, Exxon sent the letter notifying the cleaning contractors of the NORM problem in March 1987, ten months after it had identified the problem at its domestic well sites. On March 27, 1987, Exxon representatives met with Mr. John Hooper, president of ITCO, and other ITCO employees and gave them a video and a set of procedural guidelines to follow when handling NORM contaminated equipment. According to Mr. Hooper, Exxon's videotape made the health risks associated with NORM scale sound minor and the safety procedure guidelines merely suggested taking precautions to avoid breathing or ingesting airborne dust. At that time, Exxon's representatives made no mention of the likely buildup of radioactive scale on ITCO's premises even though Exxon knew the pipe scale had been accumulating on the premises for years and had learned in June 1986 that it was hazardous.
Exxon maintained that no reasonable juror could have concluded that it knew about the NORM buildup in domestic oil production tubing before 1986. We disagreed. Although the 1981 discovery of NORM inside drilling equipment was limited to the North Sea area, by that time Exxon already knew that Shell Oil had found radioactive material in equipment at a refinery in the U.K. The jury could have concluded that Exxon knew or should have known of the likelihood of NORM contamination in domestic oilfield production equipment well before Chevron's Mississippi discovery in 1986 based on Exxon's knowledge that radioactive material had been found in both drilling and refining equipment in the North Sea region coupled with the fact that just a few years earlier Exxon had discovered radioactive deposits inside equipment at several Texas gas plants. Also, in view of Mr. Collier's August 28, 1986 memo, stating, "Chevron's discovery is nothing new," the jury reasonably could have concluded that Exxon knew about the NORM deposits in its domestic oilfield equipment before 1986, and its failure to act sooner was wanton and reckless.
Exxon argued, too, that it acted to protect the public safety after Chevron's 1986 NORM discovery. Exxon emphasized that after the discovery it had conducted a nationwide NORM survey of all its facilities; it began screening used tubing for NORM at production sites and the contaminated tubing was stored  not cleaned; it began to screen tubing at central storage facilities like ITCO; it recommended safety procedures; and it began to develop a new cleaning process that would allow for the previously-stockpiled, NORM contaminated pipe to be cleaned safely.
We found no merit to Exxon's argument. Clearly, the evidence indicated that the action taken by Exxon after the Chevron discovery was to benefit Exxon, not the general public. As a result of the discovery, Exxon was faced with unprecedented environmental, legal, economic, and financial challenges. It had no choice but to act. In any event, we found Exxon's most egregious act was failing to notify ITCO of the NORM hazard immediately after it tested the Exxon Mississippi wells and discovered NORM at the well sites. Although Exxon's representatives claimed that to notify the cleaning contractors immediately would have been "premature" until they knew the extent of the problem and they did not want to "alarm" the public, we concluded that their failure to do so was inexcusable. Exxon executives had been warned that NORM posed a human safety hazard to anyone exposed to it, but they waited nine months to send the warning letter to the contractors and to meet with ITCO. Exxon's delay in notifying *521 ITCO of the danger was wanton and reckless.
Upholding the jury's finding that punitive damages were warranted in this case, we then considered whether the jury's one billion dollar award was constitutional.
Constitutionality of Punitive Damage Award
Exxon had assigned as error in the first appeal that the $1 billion punitive damage award was unconstitutional as it violated Exxon's Fourteenth Amendment right to due process of law.
In recent years, the U.S. Supreme Court has considered several cases raising exemplary damage issues. In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court ruled that exemplary damage awards that are "grossly excessive" violate the Due Process Clause of the Fourteenth Amendment. The Court then provided three "guideposts" for gauging when an exemplary damage award crosses the constitutional line: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the exemplary damage award and the harm the defendant's conduct caused, or could have caused; and (3) the size of any civil or criminal penalties that could be imposed for comparable misconduct.
The constitutional constraints on the amount of exemplary awards were again considered in Cooper Industries, Inc., supra, 532 U.S. 424, 121 S.Ct. 1678, wherein the Court ruled that state and federal appellate courts must conduct a de novo review of exemplary damage awards challenged as being grossly excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Id. at 433-434, 121 S.Ct. at 1685-1686. In mandating a de novo review, the Court reasoned that "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a `fact' `tried' by the jury." Id. at 437, 121 S.Ct. at 1686.
In State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Court further tightened the permissible limits of exemplary awards, holding that appellate "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id., 538 U.S. at 426, 123 S.Ct. at 1524.
Keeping in mind the principles outlined in BMW of North America, Inc., v. Gore, the U.S. Supreme Court's decision in State Farm Mutual Automobile Insurance Company v. Campbell, we conducted a de novo review of the jury's exemplary damage award. Our findings as a result of that de novo review were set forth in our prior opinion and read as follows.
"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, supra, at 575, 116 S.Ct. 1589. In determining the reprehensibility of a defendant, courts are instructed to consider whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S. at 576-577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders *522 any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should be awarded only if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Id. at 575, 116 S.Ct. at 1589.
In this case, it is undisputed that the plaintiffs suffered strictly economic harm, i.e., property damage. While Exxon's conduct resulted in no physical harm to them, it certainly evinced an indifference to or reckless disregard of the health and safety of others. As stated above, Exxon's nine-month delay in notifying ITCO and the other cleaning contractors of the dangers posed from handling NORM contaminated equipment certainly put their employees at risk. Even though ITCO no longer cleaned NORM contaminated piping/tubulars after March 1987, Exxon was well aware that NORM contaminated equipment remained stockpiled on ITCO's property. This posed a health hazard to those on the premises.
We also find that the target of the conduct was financially vulnerable. ITCO had leased the property from the Grefer family for many years and during that period operated a very successful business cleaning oilfield equipment. After Exxon discovered the NORM contamination in its drilling equipment and finally realized the extent of the problem, the oil company sought to wipe its hands clean and leave ITCO with the mess. Notably, on April 19, 1989, Mr. Rullman sent a memo to Mr. Roger Koerner, Exxon's top manager for the Eastern Division, regarding "ITCO Contract Recommendations." The memo stated in part:
RAE [Exxon's Regulatory Affairs Engineering] concurs with the suggestion to screen other contractors to ascertain their abilities to decontaminate NORM material, . . . The development of alternative cleaning/disposal options would help soften their stance [on contract negotiations] and may be needed anyway if the ITCO procedure does not provide sufficient cleaning. The continued use of the ITCO yard could complicate any potential personal injury liability claims since it would be difficult to determine when the exposure occurred that caused the injury. Resuming cleaning with a new contractor would clearly establish the earliest date of potential exposure, and Exxon could better contractually minimize its exposure with the new contractor. This would not, however, help Exxon with any claims from past activities at ITCO.
Shortly thereafter, ITCO's business steadily declined while Exxon sent its used oilfield equipment to new cleaning contractors. After ITCO ceased operations, terminated its lease and vacated the premises, Exxon's NORM scale remained on the premises. In addition to ITCO's failure, the Grefers are now financially burdened with the task of remediating the property.
Furthermore, we find Exxon's repeated conduct from 1985 through 1992, when ITCO finally shut down, did involve an element of deceit. Again, as mentioned above, from June 1986 to March 1987 Exxon officials intentionally withheld information regarding NORM contamination in the piping/tubulars even though they knew the scale posed a direct danger to the physical health and safety of those workers who continued to handle the NORM contaminated equipment on a daily basis. Also, after learning of the danger posed by the *523 NORM contaminated scale, Exxon took no step to remove the radioactive material from ITCO's premises. In our opinion, Exxon's conduct was reprehensible.
Next we consider the second Gore guideline, the disparity between actual or potential harm suffered by the plaintiff and the punitive damage award. For potential harm properly to enter into the ratio, it must be directly attributable to the misconduct and not to lawful or unrelated causes. See Cooper Industries, 532 U.S. at 441, 121 S.Ct. at 1688.
In Campbell, the Utah Supreme Court justified a punitive award of $145 million in a case in which the plaintiff was awarded $1 million in compensatory damages for State Farm's bad-faith failure to settle, fraud, and intentional infliction of emotional distress. On appeal, the U.S. Supreme Court considered the award under the Gore guideposts and concluded that the award was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant. Campbell, 538 U.S. at 429, 123 S.Ct. at 1526. While the Court declined to impose a bright-line ratio which punitive damages cannot exceed, it noted that its jurisprudence and the principles set forth therein demonstrate that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process. The Court recognized that although "there are no rigid benchmarks," a higher ratio could be justified only if "a particularly egregious act has resulted in only a small amount of economic damages." Id., 538 U.S. at 425, 123 S.Ct. at 1524. The Court also noted that the converse is true, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. The Court found the compensatory award of $1 million was "substantial," and concluded that the Gore guideposts "would [only] justify a punitive damages award at or near the amount of compensatory damages." Id., 538 U.S. at 429, 123 S.Ct. at 1526. The Court also rejected the Utah Supreme Court's reference to State Farm's enormous wealth to justify the award, stating, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." Id., 538 U.S. at 427, 123 S.Ct. at 1525.
This case leaves little doubt that there is a presumption against an award that has an 18 to 1 ratio. In our opinion, the compensatory award in this case was substantial; the Grefers were awarded $56,145,000.00 for a piece of property worth at most $1,500,000.00. Although the plaintiffs claimed only property damage, and no physical harm, the trial court allowed the plaintiffs to argue and present substantial evidence, over Exxon's objections, of the potential and/or alleged actual harm to other persons who were not parties to this suit and whose claims were not before the jury. For example, in their opening statement, the plaintiffs' counsel referred to the "community" and "churches immediately next to" the Grefer property. He described radium particles in "a very, very, very fine powder" being blown "all over the place." A video was shown to the jury that depicted elementary school children getting on and off a bus. Witnesses were then asked questions designed to foment the fear of a radium dust cloud blowing over houses, churches, and schools near the Grefer property. The trial court also allowed plaintiffs' counsel to question witnesses *524 about the potential harm of radiation to children and unborn children even though this case is strictly a claim for damage to immovable property. Likewise, the trial court allowed plaintiff, Rose Grefer Haase, a former nurse, to testify regarding the effects of x-ray radiation and the protections taken by those working with x-ray machines to avoid personal injury. The trial ended with a neighbor, Ms. Thelma Benjamin, testifying on rebuttal about the DEQ and Exxon failing to test her property or the property of others in the neighborhood. Plaintiffs' counsel likened the harm suffered by the Grefers with damages caused in the 1989 EXXON-VALDEZ oil spill. Much of this evidence was irrelevant and, more than likely, confused the jury, contributing to its exorbitant punitive damage award. (footnote omitted)
The plaintiffs also put on substantial evidence regarding Exxon's wealth. The jury heard that Exxon is the largest corporation in the world and had assets of $251 billion; that its revenue for the year 2000 was $228.439 billion; and that its total net worth in 2000 was $173 billion. In addition, evidence was presented of the salaries, bonuses, stock options, etc., of Exxon's corporate executives. The jury heard that the only way to punish a big corporation like Exxon for its reprehensible behavior was to hit its bank account. Plaintiffs' counsel stated that Exxon could satisfy a large punitive judgment in very little time with the interest that accrues on its $72 billion in shareholders' equity and that it likely would never feel the effect of the judgment because it would be passed on to the consumers at the gas pumps. Counsel also pointed out that Exxon recently had been cast in judgment for several other large punitive damage awards, including a case in which an Alabama jury awarded the plaintiffs punitive damages of $3.4 billion and compensatory damages of $87 million. Such assertions bore no relationship to the harm suffered by the plaintiffs. Although the jury could consider Exxon's wealth, the company's wealth could not provide an open-ended basis for inflating the punitive award. With this in mind, we find the $1 billion dollar punitive damage award is neither reasonable nor proportionate to the amount of harm to the plaintiffs and to the general damages recovered. Considering the substantial compensatory damages awarded in this case, in our opinion a lesser single-digit ratio would be appropriate.
The third guidepost in Gore is the disparity between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. The Court in Campbell noted that criminal penalties may also be considered, as the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. Campbell, 538 U.S. at 428, 123 S.Ct. at 1526. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Id. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, its higher standard of proof. Id. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically justify a punitive award. Id.

Exxon argues that it did not violate any state laws or regulations because the DEQ did not establish NORM regulations until 1989 (footnote omitted) and therefore the punitive damage award is not warranted. It also argues that the *525 maximum civil penalty under Louisiana law for willful conduct would not exceed $1,000,000.00, and thus if punitive damages are imposed, the amount should not exceed $1,000,000.00.
In the case of In re New Orleans Train Car Leakage Fire Litigation, XXXX-XXXX, p. 1 (La.App. 4 Cir 6/27/01), 795 So.2d 364 (hereinafter "CSX"), we affirmed the trial court's reduction of a jury's punitive damage award from $2.5 billion to $850 million. That case involved personal injury claims by 8,047 class members for injuries arising out of a burning train car carrying a hazardous substance. In reaching our result, we recognized the large number of claimants, their personal injury, the potential that many city blocks could have been destroyed by an explosion, and the evacuation of thousands during the night because of the danger posed by burning chemicals. Like Exxon, the defendant argued in CSX that because the maximum civil penalty under Louisiana law for its violation was slightly more than $1,000,000.00 that should have been the amount of the jury's punitive award. We disagreed, noting that "the BMW Court did not select and use the term `guideposts' without reason", and that term does not "connote or suggest a cumulative series of three `tests' or `elements' which must be met." CSX, at p. 33, 795 So.2d at 386. We then specifically rejected the notion "that the third guide . . . `caps' punitive damages." Id. at p. 33, 795 So.2d at 386-87.
The plaintiffs point to various criminal fines for violations of Louisiana statutes and regulations and give examples in which fines of tens of thousands of dollars a day would be imposed every day for the years Exxon was in violation of the law. Notably, in Cooper, the Court rejected an effort, similar to the plaintiffs' here, to suggest that the maximum fine provided by an Oregon statute would have been imposed each time a piece of promotional literature was distributed, 532 U.S. at 442-43, 121 S.Ct. at 1689, while in Campbell the Court rejected an attempt to justify a large award based on speculation about whether, in a criminal prosecution, the defendant might have lost its business, license, been imprisoned, or been required to disgorge all profits.
The fact that Louisiana had no regulations governing NORM until 1989 does not excuse Exxon's reprehensible action. And Louisiana's maximum civil penalty for willful misconduct, alone, cannot limit a punitive damage award. Nonetheless, based on our review of the record, we find that $1 billion punitive award in this case is exorbitant and must be reduced.
In summary, we find that an application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded, likely would justify a punitive damages award closer to the amount of compensatory damages. The punitive damage award of $1 billion, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of Exxon's property. Therefore, we will amend the jury's award to reduce it to an amount that we have determined is both reasonable and proportionate to the amount of harm suffered by the Grefers and to the general damages of $56,145,000.00, which is $112,290,000.00 or twice the general damage award.
Grefer, supra, XXXX-XXXX at p. 46-53, 901 So.2d at 1148-1152.
Clearly, as noted above, the conduct of Exxon satisfied the wanton and reckless requirement, i.e. it was reprehensible. *526 Any reference to harm suffered by nonparties, which Exxon finds objectionable, was used in the foregoing discussion merely to demonstrate the reprehensibility of Exxon's conduct and nowhere in the opinion do we use any evidence of harm suffered by nonparties as the basis to award an amount for exemplary damages to the Grefers. Again, any discussion of harm to nonparties was done simply to show reprehensibility. The record amply supports the finding that Exxon's conduct was reprehensible.
Second, our opinion takes into account all of the objections and concerns raised by Exxon herein in light of Philip Morris. We noted those objections and essentially sustained them in our review. We find that many of the improper arguments and evidence contributed to the verdict which in no way reflected the harm suffered by the plaintiffs and the compensatory damages which were awarded.
Third, our de novo review resulted in a drastic reduction of the jury's $1 billion punitive damage award. In reviewing the matter de novo, we disregarded the evidence of and references to harm suffered by nonparties and considered only the harm done to the Grefers in determining the amount of the punitive damage award.
Fourth, although our de novo review essentially awards exemplary damages based on the State Farm multiplier and the compensatory award, we still consider the reprehensibility of Exxon's conduct as well as the degree of reprehensibility in our award of exemplary damages. Additionally, the punitive damage award rightfully takes into account the fact that Exxon should be punished for its reprehensible conduct and deterred from repeating it. The fact that Exxon is one of the wealthiest companies in the world was another factor that we properly considered.

Summary
In this opinion we elaborate and expand on the thought process that went into our earlier opinion. But after reviewing this record and the Philip Morris decision, we stand by our initial decree with regard to the award of exemplary damages.
We interpret the remand from the U.S. Supreme Court to affect our decision as it relates to the exemplary damages and it is our opinion that the decision in no way mandated that we review the remaining assignments of error urged by Exxon and that it in no way affects our initial decision with regard to the compensatory award. Furthermore, the U.S. Supreme Court remand and the Philip Morris decision do not mandate that we order a new trial but instead allow us to correct any procedural and or substantive errors by our constitutionally delegated authority of de novo review. This court is constitutionally allowed to review both law and facts. La. Const. art. V, § 10(B).
As a final thought on the issues of reprehensibility and harm to the plaintiff, we note that during the oral argument, Exxon's attorney suggested that with regard to harm to nonparties, when considering reprehensibility, the trier of fact can only consider the harm to nonparties that is similar to the harm or injury suffered by the plaintiff. That analysis is not supported by Philip Morris, State Farm, or BMW.
In determining the reprehensibility of the defendant's conduct for the purpose of awarding exemplary damages, the trier of fact may consider the harm suffered by both parties and nonparties regardless of the type or similarity of harm suffered as a result of that conduct. On the other hand, the trier of fact may consider the nature and extent of the harm suffered by the plaintiff only in determining *527 the amount of exemplary damages to award that particular plaintiff.
Finally, Exxon cites the decision in Embry v. Geo Transportation of Indiana, Inc., 478 F.Supp.2d 914 (E.D.Ky.2007), arguing that the punitive damage award cannot stand in this case because Exxon's delay in warning persons of the NORM danger did not cause the plaintiffs property damage but rather only potential harm to nonparties.
In Embry, the defendant's truck crossed the median into oncoming traffic and caused multiple deaths and injuries. The defendant truck driver admitted that after taking a sip of coffee he choked and lost control of the truck, causing the accident. The plaintiffs argued that the defendant truck driver had fraudulently concealed his negative medical history on his job application, including that he was a recovering alcoholic, and alleged on this basis that the defendants were liable for punitive damages.[8] Citing Philip Morris, the court granted summary judgment dismissing the plaintiffs' punitive damage claims explaining that none of the alleged fraudulent acts or omission proximately caused the plaintiffs' damages and, therefore, did not satisfy the "constitutional nexus requirement." Id. at 924.
The Embry case is distinguishable from the case before us. The court clearly recognized that the defendant truck driver's failure to disclose his medical history in applying for his job and commercial driver's license several years earlier did not cause the accident. The court also noted that the plaintiffs failed to demonstrate that it was foreseeable from the fraudulently concealed medical information that the defendant would choke on coffee while driving, so as to establish that the fraud was a proximate cause of the accident. Here, we found that Exxon's failure to disclose the NORM hazard to ITCO in a timely manner demonstrated the reprehensibility of its conduct, a factor we could consider in awarding exemplary damages to the Grefers. Although Exxon's delay in disclosing the NORM hazard did not cause the Grefers physical harm, it increased their economic damages by allowing the continual accumulation of NORM scale on their property.

DECREE
Accordingly, for the reasons set forth herein, the judgment of the trial court rendered in accord with the jury verdict in favor of the Grefers is amended, in part, to reduce the $ 1 billion award for punitive damages to $112,290,000.00 to comply with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In all other respects, the judgment is affirmed. Furthermore, the trial court judgment denying Exxon's exception of prescription is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Exxon Mobil Corporation. v. Grefer, 549 U.S. ___, 127 S.Ct. 1371, 167 L.Ed.2d 156 (2007).
[2] The immovable property at issue was part of a larger tract of land purchased by the plaintiffs' great grandfather in 1875 and since then has remained in the Grefer family. The plaintiffs acquired the naked ownership of three-fourths (3/4ths) of the immovable property in February 1945 upon the death of their father, Archibald J. Grefer, Sr., and full ownership of the entire tract in March 1996 upon the death of their mother, Camille Claire Antoine Grefer.
[3] La. C.C. art. 2315.3 was originally enacted as La. C.C. art. 2315.1 by Acts 1984, No. 335, § 1. It was redesignated as Article 2315.3 under the authority of the Louisiana State Law Institute in 1986. It was repealed by Acts 1996, 1st Ex.Sess., No. 2, § 1, effective April 16, 1996. Article 2315.3 had provided:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.
[4] Grefer v. Alpha Technical, XXXX-XXXX, XXXX-XXXX (La.3/31/06), 925 So.2d 1248.
[5] For ease of reference, we have numbered the paragraphs in the jury instructions.
[6] "NORM" is the acronym for Naturally Occurring Radioactive Material.
[7] On April 10, 1986, Chevron identified radium-266 in oil filed equipment at a well site in Brookhaven, Mississippi.
[8] Punitive damages are available under Kentucky law if a plaintiff proves by clear and convincing evidence that a defendant acted with oppression, fraud or malice. Ky.Rev. Stat. Ann. § 411.184(2) (West 2006).