DENNIS R. BAGNERIS, SR., Judge.
| ,This appeal involves eight plaintiffs[1] who sued various defendants seeking recovery of damages for personal injuries allegedly suffered as a result of exposure to naturally occurring radioactive material (“NORM”)[2] while cleaning pipe and tubing belonging to Exxon Mobil Corp. (“Exxon”) at the Intracoastal Tubular Services, Inc. (“ITCO”) pipe yard in Harvey, Louisiana. Plaintiffs and defendant Exxon now appeal a judgment of the trial court, which found in favor of plaintiffs and against Exxon. For the following reasons, we hereby affirm the judgment of the trial court.

Facts and Procedural History

In April 1986, Chevron discovered radium in oilfield equipment at a well site in Mississippi, in scale built up on the interior of oil-production tubulars. For |¿years preceding this discovery, oil companies sent these used tubulars to various pipe yards for removal of the scale, so that the tubulars could be re-used. One of these pipeyards was operated by ITCO in Harvey, Louisiana. Plaintiffs in this appeal worked at ITCO at various times, mainly during the 1980’s.[3] ITCO closed in 1992. Thereafter, several lawsuits were filed by various persons alleging illnesses caused by NORM exposure at the ITCO pipeyard.
*771 The lawsuit receiving the most publicity was one filed by members of the Grefer family, owners of land leased by ITCO for its operations. The Grefers alleged contamination of their land with NORM, and sought compensatory damages and punitive damages under former La. Civ.Code art. 2315.3.[4] The Grefer trial began in April 2001. On May 22, 2001, the jury rendered a verdict against Exxon and ITCO for over $56 million in compensatory damages, and against Exxon alone for $1 billion in punitive damages. This Court, on appeal, reduced the punitive-damages award to $112,290,000.00. See Grefer v. Alpha Technical, 2002-1237 (La.App. 4 Cir. 3/31/05), 901 So.2d 1117, writ denied, 2005-1259 and 2005-1590 (La.3/31/06), 925 So.2d 1248; cert. granted, vacated and remanded on other grounds, 549 U.S. 1249, 127 S.Ct. 1371, 167 L.Ed.2d 156 (2007); on remand, 2002-1237 (La.App. 4 Cir. 8/8/07), 965 So.2d 511.
On May 23, 2001, a putative class action was filed in Civil District Court, Orleans Parish, styled Leo Pollard et al. v. Alpha Technical. Among the named plaintiffs in Pollard were five plaintiffs here: Ronald Williams, Alan Williams, Eliot Williams, Earl Williams, and John Gros. The Pollard plaintiffs sought to represent a class of former ITCO workers exposed to NORM and sought both compensatory and punitive damages. Defendants in Pollard included several oil companies, including Exxon. Pollard was later consolidated with other NORM-related class actions and re-styled In re: Harvey TERM Litigation.
About nineteen months after filing the Pollard petition, another petition was filed, Warren Lester v. Exxon Mobil Corp., the petition in this appeal. Lester is not a class action; rather it is a cumulation of hundreds of actions against numerous pipe yards and numerous oil companies. Among the hundreds of Lester plaintiffs are all the named plaintiffs in the Pollard class action. Like the Pollard plaintiffs, the Lester plaintiffs sought both compensatory and punitive damages. In response to the Lester petition, Exxon and other defendants pleaded various exceptions, including lis pendens, improper cumulation, and improper venue. The trial court sustained the lis pendens exception, ordering any named plaintiffs who were also named plaintiffs in Pollard/Harvey TERM to voluntarily dismiss themselves from Harvey TERM, or else they would be dismissed from Lester. Eventually, these plaintiffs were dismissed without prejudice from Lester, after which they voluntarily dismissed themselves from Harvey TERM and, by amended petition, rejoined the Lester suit as plaintiffs.
The trial court ordered the cases to be tried in flights according to pipe yard location. The first flight designated was a group of plaintiffs whose sole alleged exposure was at the ITCO yard. These plaintiffs were dubbed the “IHOP” flight (ITCO Harvey only plaintiffs). The trial court sustained Exxon’s exception of | improper venue as to the IHOP flight and transferred the IHOP flight to 24th Judicial District Court, Jefferson Parish.[5]
*772 Thereafter, in Orleans Parish, the trial court granted plaintiffs’ motion to designate a flight of “ITCO mostly plaintiffs” (acronym “IMOP”), who alleged most but not all of their exposure at the ITCO yard. This IMOP flight is the subject of the current appeal. The IMOP flight included three plaintiffs with cancer: John Cade (skin and prostate cancer), Murphy Vi-donne (skin cancer), and Isiah Kellup (lung cancer). It also included eight plaintiffs without any diagnosed disease caused by NORM: Timothy Crowley, John Gros, Jeffrey Liberta, Ronald Schwary, Ronald Williams, Eliot Williams, Earl Williams, and Alan Williams.
A bench trial for this flight of plaintiffs began on September 12, 2011, and lasted three weeks. On May 21, 2012, the trial rendered the following judgment: (1) it dismissed all claims against ITCO; (2) it dismissed the claims of two plaintiffs with cancer (John Cade and Murphy Vidonne), finding that John Cade failed to prove sufficient exposure to NORM to cause cancer, and that Murphy Vidonne failed to prove a causal connection between NORM exposure and his skin cancer; (3) it found in favor of plaintiff Isiah Kellup, finding that exposure to NORM was a contributing cause of his lung cancer but also finding that a 40% cause was his heavy cigarette smoking and awarded him $1,500,000.00[6]; and (4) it found in favor of the plaintiffs without cancer and awarded all eight plaintiffs | .^compensatory damage for fear of cancer and punitive damages, and awarded five of the plaintiffs [Timothy Crowley, Jeffrey Liberta, Eliot Williams, Ronald Williams, Alan Williams] damages for increased risk of cancer and medical monitoring.
Exxon filed a motion for new trial or remittitur, and plaintiffs filed a motion for new trial. After the hearing of these motions, the trial court signed an amended judgment, which made the same award to Isiah Kellup, and the same compensatory damage awards to the other plaintiffs, but reduced the punitive damage multiplier of 3 times all compensatory damages to a multiplier of 1.5 times all compensatory damages. Accordingly, the damages awarded in the amended judgment to the no-cancer plaintiffs (the only plaintiffs in this appeal) are as follows:
(1) Timothy Crowley — $250,000.00 for increased risk of cancer, $33,682.00 for medical monitoring, $50,000.00 for fear of cancer, $500,523.00 for punitive damages. Total damages are $834,205.00.
(2) Jeffrey Liberta — $150,000.00 for increased risk of cancer, $46,098.00 for medical monitoring, $50,000.00 for fear of cancer, $369,147.00 for punitive damages. Total damages are $615,245.00.
(3) Alan Williams — $250,000.00 for increased risk of cancer, $40,858.00 for medical monitoring, $40,000.00 for fear of cancer, $496,287.00 for punitive damages. Total damages are $827,145.00.
(4) Eliot Williams — $350,000.00 for increased risk of cancer, $45,980.00 for medical monitoring, $50,000.00 for fear of cancer, $668,970.00 for punitive damages. Total damages are $1,114,950.00.
(5) Ronald Williams — $250,000.00 for increased risk of cancer, $40,757 for medical monitoring, $50,000 for fear of can *773 cer, $511,135.50 for punitive damages. Total damages are $851,892.50.
(6) John Gros — $50,000.00 for fear of cancer, $75,000.00 for punitive damages. Total damages are $125,000.00.
(7) Ronald Schwary — $50,000.00 for fear of cancer, and $75,000.00 for punitive damages. Total damages are $125,000.00.
|6(8) Earl Williams — $40,000.00 for fear of cancer, $60,000.00 for punitive damages. Total damages are $100,000.00.
DISCUSSION
On appeal, Exxon alleges the following assignments of error:
1. With respect to all eight plaintiffs, the trial court erred in awarding compensatory damages for fear of cancer.
2. With respect to five plaintiffs (Timothy Crowley, Jeffrey Liberta, Alan Williams, Eliot Williams, and Ronald Williams), the trial court committed two errors:
a. The trial court erred in awarding damages for medical monitoring.
b. The trial court erred in awarding damages for increased risk of cancer.
3. The trial court’s awards of punitive damages are erroneous for the following reasons:
a. No plaintiff receiving punitive damages suffered an actual injury.
b. Regardless of whether Exxon’s conduct amounted to ordinary negligence, it did not approach the wanton or reckless conduct required to award punitive damages under former art. 2315.3.
c. Plaintiffs’ claims for compensatory damages did not accrue during the time that former art. 2315.3 was in effect.
4.In the alternative, the trial court’s punitive-damage awards are excessive for the following reasons:
a. The multiplier chosen by the trial court-150% of compensatory damages-bears no relation to the defendant’s culpability.
b. Plaintiffs have already been awarded substantial compensatory damages despite having suffered no actual injury.
c. Plaintiffs’ awards for fear of cancer overlap their awards for punitive damages.
|7d. Exxon complied with all then-applicable DEQ regulations.
e. Because Exxon’s conduct was neither wanton nor reckless, it was likewise not reprehensible.
f. Exxon has already paid over $112 million in punitive damages for the identical conduct at issue here.
The plaintiffs answered Exxon’s appeal and alleged the following three assignments of error:
1. The trial court erred in failing to award damages to John Gros, Ronald Schwary, and Earl Williams for increased risk of developing cancer and medical monitoring;
2. The trial court erred in failing to award legal interest on all damages, and in excluding punitive “ex delicto” damages from date of judicial demand until paid; and
3. The trial court committed legal error in granting Exxon’s motion for new trial on the issue of the multiplier for punitive damages wherein the multiplier was reduced from 3 times the compensatory damages to 1.5 times the compensatory damages.

*774
Issue One: Damages for Fear of Cancer

The trial court awarded six plaintiffs[7] $50,000.00 each and two plaintiffs[8] $40,000.00 each in damages for the fear of contracting cancer. In this assignment of error, Exxon contends that these awards are in error, arguing that fear of a future injury must be more than speculative or merely possible. Exxon argues that plaintiffs failed to carry their burden of proof that their claim is not spurious by showing a particular likelihood of genuine and serious mental distress arising from special circumstances.
IsThe plaintiffs argue that the record supports the trial court’s award of damages for fear of cancer for all eight plaintiffs especially since it was proven at trial that this radiation is a known carcinogen and that the levels of exposure for all eight plaintiffs were well above the threshold of 10 rem[9] where it has been concluded that radiation causes cancer in humans.
The legal standard for the recovery of negligent infliction of emotional distress absent physical injury is that the plaintiff must show an “especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.” Bonnette v. Conoco, Inc., 01-2767, pp. 22-23 (La.1/28/03), 837 So.2d 1219, 1234 citing Moresi v. State Through Dep’t of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La.1990). This Court addressed this legal standard in Doerr v. Mobil Oil Corp., 04-1789 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, and stated:
First, in Bonnette, the court was concerned with the speculative nature of the claims therein, the potential for spurious claims, and the difficulty in distinguishing valid from spurious claims. Hence, the Court imposed the additional burden on the plaintiff to establish factor(s) which would support a finding that his claim was valid. The existence of physical injury is one such factor, but others may also exist. Proximity to the event, witnessing injury to others, and contemporaneous reports from reliable sources that the danger is real are also indicia of the reliability of claims of emotional distress.
[[Image here]]
Second, it is a troubling proposition that a tortfeasor can be relieved of responsibility if its conduct produces minimal harm, albeit to many people. Surely a 19wrong that causes a hundred dollars of harm to ten thousand people is of no less concern than a wrong that causes a million dollars of harm to an individual. To declare the former harm de minimus, and not worthy of redress is to undermine the dual concerns of tort law: accountability for the wrongdoer and compensation for the victim.
Doerr, 04-1789, pp. 9-10, 935 So.2d at 237-238.
In finding that the plaintiffs’ claims were not spurious, the trial court gave lengthy, but well written reasons for awarding plaintiffs damages for fear of cancer. Specifically, the trial judge stated:
*775 Although the yard [ITCO] closed in 1992, each plaintiff first learned about a possible exposure during 2001; none of the plaintiffs fully understood or appreciated the ramifications of the exposure, namely the increased risk of developing cancer, until the months preceding trial, when they were examined by Dr. Daniels in February 2011....
Plaintiffs Crowley, Gros, Liberta, Schwary, A. Williams, Earl Williams, Eliot Williams and R. Williams have not been diagnosed with cancer but contend that they possess a fear of developing cancer. Under La. Civ.Code art. 2315, such damages are available only when there is a manifest physical or mental injury or disease. When determining whether plaintiffs are entitled to recover emotional distress damages in the absence of manifest physical injury, the plaintiffs must show that their claim is not spurious by evidencing “a particular likelihood of genuine and serious mental distress arising from special circumstances.” Bonnette v. Conoco, Inc., 01-2767 p. 24-25 (La.l/28/03), 837 So.2d 1219, 1235. Similarly, a review of cases where plaintiffs sought damages for the fear of developing cancer shows that the courts of this state generally look for instances of manifest injury. For example, the court in In re New Orleans Train Car Leakage Fire Litigation, 00-0479 (La.App. 4 Cir. 06/27/01), 795 So.2d 364, awarded damages for fear of cancer and mental anguish after a derailed train carrying carcinogenic chemicals vaulted into a neighborhood, exploded and caused evacuations, eye irritations and other health concerns. The court reasoned that since trains continue to go through the neighborhood, |inthe security normally associated with the home eroded, as evidenced by residents keeping a packed bag at the door or sleeping in their clothes. See also, David v. Our Lady of Lake Hosp., Inc., 02-1945 (La.App. 1 Cir. 06/27/03), 857 So.2d 529 (awarding damages for the fear of cancer after plaintiff received a transfusion of contaminated blood, causing him to develop Hepatitis C, cirrhosis of the liver and a significantly increased likelihood of contracting cancer); and Lemaire v. CIBA-GEIGY Corp., 1999-1809 (La.App. 1 Cir. 6/22/01), 793 So.2d 336 (granting damages for the fear of cancer to an environmental cleanup worker who was exposed to a known cancer-causing agent after he was twice hospitalized, developed proteinuria, back and kidney problems and insomnia).
Dr. Philip Plato served as plaintiffs’ primary expert on calculating dose exposure. Before discussing the methods by which Dr. Plato calculated the plaintiffs’ dose exposure, identifying critical terms, including a broad understanding of how humans can contract cancer via exposure to the alpha particles emitted from radium 226 and radium 228, proves helpful.
Dr. Plato testified that there are two ways by which cancer causing alpha and beta particles can access the body. The first method is by inhalation. The second occurs when an inception point is created, as when a significant enough dose affixes to a small volume of tissue. Regarding the dose exposure, or the volume of radiation to which each plaintiff was exposed, Dr. Plato identified that the radiation dose denotes the number of ionized atoms per cube of tissue. The unit of measurement for quantifying the unit of dose to tissue is called a rem. (Footnote omitted). Lastly, under these guidelines, according to Dr. Plato, the threshold volume of exposure for contracting cancer due to ionizing radiation is a minimum of 10 rems.
*776 In performing dose reconstruction, Dr. Plato identified the three-step process he employed. First, he identified the tasks done at each work specific location. Second, he estimated the volume of time each plaintiff spent performing the task. Lastly, he reconstructed the dose rate for each task at each work location. However, Dr. Plato, by his own admission, encountered some difficulties because (1) the plaintiffs did not use radiation monitoring equipment; (2) the workers discussed, from memory, work done many years before; and (3) the |nabsence of measures of radiation in the air required him to estimate the concentration of airborne particles, the fraction of such particles that was scale, and the breathing rate of each worker.
Dr. Plato also admitted that the numbers he projected, derived and ultimately used for these calculations were exaggerated. As he indicated, absent the use of monitoring devices that could contemporaneously determine each plaintiffs actual exposure rate, making an accurate determination of each plaintiffs dose proved difficult. Consequently, any calculations provided must have relied on a number of extrapolations using the limited data available. In reconstructing the dose for each plaintiff, Dr. Plato used a combination of best estimates and post-exposure measurements gathered from visits to the ITCO yard. This methodology (footnote omitted) included estimates on breathing rate for adult males based on EPA standards, the volume of airborne particles based on data from EPA and other studies and the approximate percentage of time each plaintiff worked near used pipes. It is also worth noting that Dr. Plato, during examination, admitted his calculations were not based entirely on radium 226, the substance contained within the scale and the scale dust, but rather were based on the “daughters of radium” that is, those elements with properties similar to but different from radium 226. Specifically, he asserted that his calculations relied on instances of inhalation of both radium 228 and thorium 228, with the majority of his dose reconstruction based upon thorium 228.
[[Image here]]
When determining damages for the increased risk of contracting cancer and the fear of contracting cancer, this Court considered the following factors: the number of years for which the plaintiff worked at ITCO, the dose or exposure rate of each plaintiff, the existence of a manifest injury for that particular plaintiff, whether or not there was a causal link between NORM, the manifestation and whether or not the section in which the plaintiff worked cleaned tubulars containing NORM and the length of time for which the plaintiff actually knew he had an increased likelihood of developing cancer. For most of the plaintiffs, this knowledge became actualized on or about the date of examination by Dr. Daniels.
112After reviewing the record, it is evident that none of the plaintiffs seemed to fully understand or appreciate the ramifications of the NORM exposure, namely the increased risk of developing cancer, until they were examined by Dr. Bertha Daniels, an expert medical doctor with a subspecialty in family medicine, in February 2011. Further, the record establishes that all eight of the plaintiffs sustained a lifetime exposure to the various radioactive isotopes in excess of 10 rems and that there is no doubt according to the medical experts that a dose in excess of 10 rems results in a risk of developing cancer. All eight plaintiffs testified at trial that they have daily concerns and worries about the *777 future of their health and the fact that they are at a higher risk of having cancer now that they have been exposed to NORM while working at ITCO. Specifically, Jeffrey Liberta testified regarding his anxieties about the future as follows:
I have concerns about my wife and I. I have concerns [of] what will happen in the future. This weighs heavily on people’s minds at times. I don’t understand why a person in his 40’s would have to deal with this in the past, present and the future.
And with my increased exposure in— of cancer related to the ITCO and Exxon, it’s not like when I’m going to get cancer — I’m sorry. It’s not like if I’m going to get cancer, it’s when I’m going to get cancer.
According to Ronald Williams, he gets panic attacks when he thinks about the idea of having cancer and that “all he can do is pray and hope to God that it dissolves or it goes away” because he can’t change the situation. Mr. Timothy Crowley testified that he is worried about his future and his health and that “he wants to still be here and be with my [his] grand-kids and still have a good life.” John Gros testified that his biggest issue “is time I might not have in the future that I planned 11son having, you know, five years ago.” Earl Williams testified that he has anxiety and stress over the exposure to NORM and stated, as follows:
Well, I’m most like every man who got a wife and kids and grandkids and everything. But I sat [sic] that aside, you know, ‘cause I’m more worried about me right now and that any day I could, you know, wake up one morning and catch cancer, and I can go down. My body could start evaporating on me. And I already have been through a lot, you know, been injured and everything in the oil field.
Alan Williams testified that he has anxiety and fear just knowing that his exposure to NORM while working at ITCO increased his risk of catching cancer in the future. Because of his anxiety, Alan Williams testified that Dr. Daniels put him on high blood pressure medicine and gave him some cream for rashes on his body. Eliot Williams testified that he feels as though he has been cheated out of his own life and that he would not have worked at ITCO had he been told the risks associated with working there. Ronald Schwary also testified that he has psychological and emotional problems that resulted from being told of his exposure to NORM and that he fears he won’t be able to have kids.
Based on the record before us, and the unique facts and circumstance of this case, we find that the trial court did not abuse its discretion in awarding damages for fear of cancer to these eight plaintiffs.

Issue Two: Damages for Medical Monitoring

On appeal, Exxon argues that the trial court erred in awarding medical monitoring damages to five[10] of the eight plaintiffs because plaintiffs failed to prove a manifest physical injury caused by NORM. Specifically, Exxon alleges 114that even though Dr. Daniels and Dr. John Amoss, Exxon’s independent medical examiner, found that four of the plaintiffs [Timothy Crowley, Jeffrey Liberta, Eliot Williams, and Ronald Williams] had a positive fecal hemoccult,[11] and one plaintiff [Alan Williams] had an elevated creatinine ki- *778 nase, these test results are not, in themselves, manifest physical injuries and moreover, plaintiffs failed to prove a causal connection between the tests and their exposure to NORM.
Contrarily, plaintiffs allege that Dr. Daniels clearly testified that they suffered manifest physical injuries and that their injuries were causally related to the exposure to ionizing radiation. Plaintiffs argue that it would be absurd to interpret a statute that allows for medical monitoring, a system designed for early detection and prevention of disease in exposed populations, to only be allowed damages for monitoring the disease once the disease itself is diagnosed.
The Louisiana Supreme Court in Bourgeois v. A.P. Green Industries, Inc., 97-3188, pp. 9-11 (La.7/8/98), 716 So.2d 355, 360-61, lists seven criteria on which a court can base an award of the reasonable cost of medical monitoring as an item of damage under La. C.C. art. 2315: (1) significant exposure to a proven hazardous substance; (2) as a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease; (3) plaintiffs risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease; (4) a monitoring procedure exists that makes the early detection of the disease possible; (5) the monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according | xlito contemporary scientific principles; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (7) there is some demonstrated clinical value in the early detection and diagnosis of the disease. In Bourgeois, the Louisiana Supreme Court addressed the reasoning behind awarding damages for medical monitoring, and stated in pertinent part:
An action for medical monitoring seeks to recover the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm. Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 821 (1993). The theory behind such recovery is simple. When a plaintiff is exposed to a hazardous substance, like asbestos, it is often sound medical practice to undergo periodic examinations to ascertain whether the plaintiff has contracted a disease. Cook v. Rockwell Int’l Corp., 755 F.Supp. 1468, 1477 (D.Colo.1991). This is because asbestos, like other modern environmental toxins, affects the body in ways that often do not become manifest for many years. Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 977 (Utah 1993). Unlike a car crash, asbestos exposure is an accident almost always without impact. Nevertheless, it is still an accident that can have consequences every bit as real as those sustained in a head-on collision. In fact, it is precisely because asbestos can have such deadly consequences that plaintiffs, regardless of whether or not they are currently suffering from a disease, are often encouraged to submit to regular diagnostic testing.
No one disputes that an individual has a legally protected interest in avoiding physical injury. Thus, when a defendant’s tortious act causes someone bodily harm, be it a broken armor asbestosis, the law clearly affords recovery. Furthermore, no one disputes that a physically injured plaintiff has a legally protected interest in avoiding economic harm in the form of costly medical testing. Thus, when a defendant’s tortious act causes someone bodily harm and *779 that person is made to incur medical expenses as a result, the law clearly affords recovery for these expenses. Hansen, 858 P.2d at 976; Ayers v. Township of Jackson, 106 N.J. 557, 525 A.2d 287, 311 (1987). The reason these expenses' are recoverable, however, is because defendant’s fault caused plaintiff to incur them. This reasoning applies as | ^persuasively to plaintiffs who have suffered physical injury as it does to those who have not. In either case, a plaintiff has suffered legal detriment in the form of costly medical bills. Hansen, 858 P.2d at 977. Because a plaintiffs liability for the bills will be the same regardless of whether he or she manifests a physical injury, it makes little legal sense to compensate one plaintiff and not the other. Hence, as long as a plaintiff can demonstrate a need for medical testing arising out of a defendant’s tortious act, it logically follows that the defendant should make the plaintiff whole by paying the cost of these examinations. Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 826 (D.C.Cir.1984),
Bourgeois, 97-3188, pp. 4-6, 716 So.2d at 358-59.
On July 9, 1999, the Louisiana Legislature amended La. C.C. art. 2315 to add another requirement to the Louisiana Supreme Court’s seven factors: the plaintiff must show that the treatment is “directly related to a manifest physical or mental injury or disease.” See La. C.C. art. 2315(B). The provisions of the Act were made “applicable to all claims existing or actions pending on its effective date and all claims arising or actions filed on and after its effective date.” See Acts 1999, No. 989, eff. 9 July 1999 § 3; Bonnette, 01-2767 at p. 15, 837 So.2d at 1230 n. 6.
After listening to the medical testimony at trial, the trial court awarded medical monitoring for Timothy Crowley in the amount of $33,682.00; Jeffrey Liberta $46,098.00; Alan Williams $40,858.00; Eliot Williams $45,980.00, and Ronald Williams $40,757.00. In her reasons for judgment, the trial judge relied upon the medical testimony to find that the five plaintiffs suffered manifest physical injuries that were causally related to the exposure of ionizing radiation that came from the pipes they cleaned at the ITCO yard. Specifically, the trial court stated:
117Pr. Bertha Daniels, an internal medicine doctor, performed physical examinations and tests on the surviving members of this flight of plaintiffs. Among other things, each plaintiffs examination included a complete blood cell count, a comprehensive metabolic panel, urinalysis, and a digital rectal exam. (Footnotes omitted). The latter examination was part of a test for fecal occult blood. Through her in-office examinations, Dr. Daniels determined that Messrs. Crowly, Liberta, Alan Williams, Eliot Williams, and Ronald Williams each experienced blood in the stool, a symptom typical but not dispositive of colon cancer. (Footnote omitted) She further testified that colon cancer is within the ambit of injuries that could stem from exposure to hazardous levels of ionizing radiation. In light of these findings, Dr. Daniels opined that the plaintiffs with blood in the stool, medically termed a positive hemoccult, require gastroenterology evaluations. She further opined that, coupled with the exposure to ionizing radiation, the mere presence of this abnormality suggests gastrointestinal cancer and therefore necessitates that the first phase of these examinations should be a colonoscopy.
Exxon’s independent medical examiner, Dr. John Amoss, agreed with both Dr. Daniels’ assessment that a positive *780 hemoccult is indicative of a disease process and the conclusion that these test results are indicative of an abnormality. In short, Dr. Amoss agreed that a positive hemoccult may indicate the beginning of a cancer process. To properly assess whether or not these plaintiffs are experiencing benign, precancerous or cancerous polyp growths, Dr. Daniels recommended monitoring them through quinquennial colonoscopy examinations. Dr. Daniels testified that the plaintiffs exposure to harmful levels of ionizing radiation put them at greater risk for developing cancer and therefore merits more frequent examination than the general population, which, contrastingly, is encouraged to undergo a colonoscopy once decennially. Likewise, Dr. Daniels opined that since cancers generally have a long latency period before manifesting, the plaintiffs with a positive fecal hemoccult should, as part of a medical monitoring regime, undergo a battery of semiannual cancer screening exams that include both physical and laboratory testing.
Both Drs. Daniels and Amoss testified that a positive hemoccult, an elevated creatinine kinase, and/or an opacity in the left lung are [ ^abnormalities and that these testing results in these five plaintiffs reflect their exposures to unsafe levels of ionizing radiation at ITCO. Based upon the reading of La. C.C. art. 2315 at the time this action was filed, as well as the case law, we find no error in the trial court judgment to adopt the recommendations of both Drs. Daniels and Amoss and award medical monitoring in order to prevent more serious injuries for these five plaintiffs in the future.
Plaintiffs answered the appeal arguing that the trial court erred in failing to award medical monitoring damages to John Gros, Ronald Schwary, and Earl Williams. Although the trial court acknowledged that all three of these plaintiffs were exposed to NORM, it found no medical testimony or evidence to support a causal connection between these three plaintiffs’ abnormalities and their exposure to NORM at ITCO. As previously stated, the Louisiana Legislature amended La. C.C. art. 2315 in 1999 to decree that tort damages do not include the cost of medical monitoring unless it is directly related to a manifest injury. Specifically, La. C.C. art. 2315 B states:
Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease.
After reviewing the record, we agree with the trial judge that these three plaintiffs failed to produce sufficient evidence at trial to indicate a causal linkage between their NORM exposure at ITCO and their abnormal test results. In light of the amendment to La C.C. art. 2315, we find no |1flmanifest error in the trial court’s judgment to dismiss John Gros’, Ronald Schwar/s, and Earl Williams’ claims for medical monitoring.

Issue Three: Damages for Increased Risk of Cancer

Exxon argues that the trial court erred in awarding Timothy Crowley, Jeffrey Li-berta, Alan Williams, Eliot Williams, and Ronald Williams, damages for increased risk of cancer because these awards compensate them for the speculative possibility of their contracting cancer sometime in the future. Exxon acknowledges that the plaintiffs have a right to bring another action in the future if they ever get cancer; thus, the awards allow an impermissible double recovery.
*781 Plaintiffs, on the other hand, argue that the Louisiana Supreme Court, in Bonnette, supra, held that increased risk of getting a disease is a valid separate cause of action under La C.C. art. 2315. Thus, plaintiffs argue that there is no double recovery between the increased risk of cancer and the claim for cancer. For the following reasons, we agree.
In Bonnette, the plaintiffs were property owners who brought an action against a refinery owner for damages arising from exposure to asbestos contained in the dirt the plaintiffs purchased from contractor used by the refinery owner to remove and replace soil from site of demolished houses near refinery. After a bench trial, the trial court awarding plaintiffs compensatory personal injury damages, property damages, damages for fear of cancer, damages for increased risk of a future injury, and punitive damages. After the court of appeal affirmed, the Louisiana Supreme Court affirmed in part and reversed in part. Specifically, the Louisiana Supreme Court held that compensatory damages for increased risk of contracting cancer in the future were not warranted; plaintiffs could not recover for | ^mental anguish; punitive damages were not warranted; but that there was sufficient evidence to establish 10 percent diminution in value. Thus, in Bonnette, the Louisiana Supreme Court acknowledged a cause of action for damages for increased risk of contracting cancer as a valid claim despite the fact that plaintiffs failed to prove entitlement to these damages. Bonnette, 01-2767, p. 21-22, 837 So.2d at 1233.
Further, on April 19, 2013, the Louisiana Supreme Court denied a writ application in Lester v. Exxon Mobil Corp., 10-743 (La.App. 5 Cir. 5/31/12), 102 So.3d 148, whereby the jury awarded plaintiffs (who had also cleaned pipes at ITCO and were exposed to NORM) damages for their increased risk of cancer. Accordingly, we find that there is a separate cause of action for an increased risk of getting a disease and that the trial court properly awarded damages in regards to this cause of action. It is worth noting that Exxon does not allege plaintiffs failed to support this cause of action, but only that the award for increased risk of cancer is contrary to Louisiana law and violates its right to due process.
Plaintiffs answered the appeal arguing that the trial court erred in failing to award increase of risk of cancer damages to John Gros, Ronald Schwary, and Earl Williams. Similar to the medical monitoring damages above, the trial court failed to find medical evidence linking these three plaintiffs’ test abnormalities to their exposure to NORM at ITCO. In Bonnette, the Louisiana Supreme Court declined to extend Bourgeois I to allow recovery of compensatory damages for a “slightly” increased risk of developing cancer. Bonnette, 01-2767, p. 17, 837 So.2d at 1231. Specifically, the Louisiana Supreme Court stated:
|21In Bourgeois I, this court allowed recovery under limited circumstances of medical monitoring costs to plaintiffs suffering an increased risk of contracting a serious latent disease when they can successfully prove by competent expert testimony, inter alia, that they have suffered a significant exposure to a hazardous substance and the increased risk of developing such a disease is significant. We find it would be nonsensical to allow a plaintiff to recover compensatory damages for an increased risk of developing an asbestos-related disease upon less proof than that required for recovery of medical monitoring expenses.

Id.

Based on this case law as well as the fact that we have already found that *782 these three plaintiffs failed to produce sufficient medical evidence at trial to indicate a causal linkage between the NORM exposure at ITCO and their abnormal test results to award medical monitoring, we find no manifest error in the trial court’s judgment to deny damages for increase risk of cancer to John Gros, Ronald Schwary, and Earl Williams.

Issue Four: Punitive Damages

Exxon appeals the trial court’s award for punitive damages arguing that it should be reversed or, at the very least, substantially reduced. Exxon contends that the punitive damage awards must be reversed because plaintiffs have no actual injury, the trial court did not make a finding of wanton or reckless conduct, plaintiffs’ claims did not accrue when former La. C.C. art. 2815.3 was in effect, and the amount of punitive damages violates due process.
In contrast, plaintiffs argue that all eight plaintiffs were awarded actual damages upon which exemplary damages are based, that there was sufficient evidence at trial of Exxon’s wanton and reckless conduct, that all of the plaintiffs |¾2⅛1 this appeal were exposed to NORM during the effective time of La. C.C. art 2315.3, and that the punitive damages are reasonable and appropriate. We agree.
Former La. C.C. art. 2315.3 was enacted in 1984 and later was repealed by La. Acts 1996, 1st Ex.Sess., No. 2, § 1, effective April 16, 1996. The former article provided, in pertinent part:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiffs injuries were caused by the defendant’s wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
A plaintiff could recover exemplary damages if he could prove: (1) that the defendant’s conduct was wanton and reckless by proving that the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position, or that the defendant engaged in highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent; (2) that the danger created by the defendant’s wanton or reckless conduct threatened or endangered public safety; (3) that the defendant’s wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) that the plaintiffs injury was caused by the defendant’s wanton or reckless conduct. Bonnette, 01-2767, pp. 27-28, 837 So.2d at 1237, quoting Billiot v. B.P. Oil Co., 93-1118, pp. 16-17 (La.9/29/94), 645 So.2d 604, 613.
In its reasons for judgment regarding punitive damages, the trial court stated:
After the discovery of NORM in tubu-lars used a operations in the North Sea during 1981, there were industry meetings and discussions regarding those findings; Exxon was aware of this dialogue. Considering that Exxon admitted using the same seawater injection methods in wells located in the Gulf of Mexico, this | ^Court is persuaded by the testimony of Dr. Paul Templet, plaintiffs’ expert in chemical physics, and Exxon representatives Lindsey Booher and Wayne Clark, that, upon the 1981 disclosure, Exxon should have begun an investigation into whether or not radioactive scale existed in its used production equipment.
Plaintiffs posit that Exxon omitted to act because an acknowledgement of radioactivity in produced waters would *783 entail losing a Resource Conservation Recovery Act (“RCRA”) exemption for oilfield waste from the Environmental Protection Agency. In 1980 amendments to RCRA, Congress temporarily exempted several types of solid wastes, including produced waters, pipe scale, and drilling fluids, from regulation as hazardous wastes. Congress also determined that none of these items required special procedures for transportation or disposal.
Trial evidence showed that losing the exemption was projected to have cost Exxon $750 million the first year and $150 million each year thereafter. The Court is not persuaded by the argument Exxon omitted to act in order to preserve the RCRA exemption. The RCRA exemption specifically addressed produced waters and pipe scale but did not encompass ionizing radiation. Since the matter at bar does not require contemplating the applicability of RCRA standards, any such argument is not germane to this discussion.
By 1986, the year when NORM was discovered at one of Chevron’s Mississippi operations, the employment relationship between ITCO and three of the remaining plaintiffs, Timothy Crowley, Jeffrey Liberta and Isiah Kellup, had terminated; a fourth, Eliot Williams, worked for only three weeks during 1988. Dr. Plato testified that all the plaintiffs reached the threshold 10 rem exposure level prior to 1984. Defendants contend that any fear of contracting cancer could not have occurred before May 2001, when the Grefer verdict was rendered and plaintiffs first learned about their increased risk due to exposure to NORM. Plaintiffs assert that each 10 rem exposure was substantial, not merely the first such exposure. This Court is not persuaded by defendant’s [sic] argument. Rather, this Court finds that only those plaintiffs employed by ITCO during the applicability of former La. Civ.Code art. 2815.3 are eligible to receive punitive damages.
|⅞4⅛ determining punitive damages, courts have used many factors. In State Farm v. Campbell, (2003) 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, the United States Supreme Court determined that the highest multiplier available for punitive damages is nine times the award of compensatory damages. While Exxon became aware of a problem with NORM in used tubulars in 1981, it did not alert ITCO until 1987. From that point forward, ITCO did not allow Exxon to bring radioactive pipe onto the ITCO yard. Accordingly, this Court will not consider awarding punitive damages beyond 1987. Former La. Civ.Code art. 2315.3, the law governing such damages, went into effect during 1984, leaving three years of applicability.
In Grefer, supra, this Court found that Exxon’s conduct was reckless in failing to notify ITCO of the NORM hazard immediately after it tested the Exxon Mississippi wells and discovered NORM at the well, sites. Specifically, this Court stated:
... the action taken by Exxon after the Chevron discovery was to benefit Exxon, not the general public. As a result of the discovery, Exxon was faced with unprecedented environmental, legal, economic, and financial challenges. It had no choice but to act. In any event, we find Exxon’s most egregious act was failing to notify ITCO of the NORM hazard immediately after it tested the Exxon Mississippi wells and discovered NORM at the well sites. Although Exxon’s representatives claimed that to notify the cleaning contractors immediately would have been “premature” until they knew the extent of the problem and they did not want to *784 “alarm” the public, their failure to do so is inexcusable. Exxon executives had been warned that NORM posed a human safety hazard to anyone exposed to it, but they waited nine months to send the warning letter to the contractors and to meet with ITCO. Exxon’s delay in notifying ITCO of the danger was wanton and reckless. After all, the ITCO employees were the persons handling the NORM contaminated piping/tubu-lars on a daily basis and were most at risk, not Exxon’s executives.
Grefer, 02-1237, pp. 43-44, 901 So.2d at 1147. After reviewing the record, we too find that Exxon’s conduct was reckless in waiting nine months to notify ITCO of | gfithe dangers associated with handling NORM. Under these facts, we find no error in the trial court’s award of punitive damages and find that the trial court’s award of 1.5 times the compensatory damages was not only appropriate but reasonable.
Although plaintiffs argue on appeal that the trial court erred in reducing the multiplier for punitive damages from 3 to 1.5 times the compensatory damages at the hearing for a new trial, we find no merit in this assignment of error.
La. C.C.P. art. 1972 provides:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
Additionally, La. C.C.P. art. 1973 provides: “[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.” The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Campbell v. Tork, Inc., 03-1341, p. 4 (La.2/20/04), 870 So.2d 968, 971. In considering whether to grant a motion for a new trial, “the trial court may evaluate the evidence without favoring either party, it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness.” Id. (citations omitted).
Trial courts often grant a new trial to adjust damage awards rendered in a bench trial. See Talbert v. Evans, 11-1096, p. 4 (La.App. 4 Cir. 3/7/12), 88 So.3d 673, 676 (granting motion for new trial and reducing the damage award and reapportioned fault); DiMaggio v. Williams, 04-1415, p. 3 (La.App. 5 Cir. 3/29/2005), 900 So.2d 1014, 1017 (granting motion for new trial and reduced special damage award); Monk v. State ex rel. DOTD, 05-97, p. 3 (La.App. 3 Cir. 6/29/2005), 908 So.2d 688, 692 (granted motion for new trial and amended damages). Because trial courts have considerable discretion to change damage awards following bench trials, we find that the trial court acted within its authority and discretion in reducing the multiplier from 3 to 1.5 of the compensatory damage award for the punitive damage award.
Plaintiffs also argue on appeal that the trial court erroneously refused to attach prejudgment interest to the punitive damages award. We find no merit in this argument as well. This Court denied prejudgment interest on punitive damages in In re New Orleans Train Car Leakage Fire Litigation, 00-0479 (La.App. 4 Cir. *785 6/27/01), 795 So.2d 364. In Grefer, this Court cited to Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141 (La.App. 1st Cir.1993), writ denied, 623 So.2d 1335, 1336 (La.1993) cert. denied, 510 U.S. 1094, 114 S.Ct. 926-27, 127 L.Ed.2d 219 (1994), for the proposition that “[ujnder both Louisiana and federal law, a plaintiff is entitled to interest on punitive damages only from date of judgment.” Grefer, 02-1237, p. 54, 901 So.2d at 1152. Because this Court has held that legal interest on punitive damages under former La. C.C. art. 2315.3 accrues from the date of judgment, we find no error in the trial court’s judgment in this regard.
Although Exxon does not assign as error its prescription argument, it does raise this issue in its appellate brief. However, as both parties correctly point out in their briefs, the prescription issue has been decided against Exxon in Duckworth v. Louisiana Farm Bureau Mut. Ins. Co., 11-2835 (La.11/2/12), - So.3d -, 2012 WL 5374248. Accordingly, we find no merit in this argument.
For these reasons, we hereby affirm the judgment, signed on July 6, 2012 in favor of plaintiffs and against Exxon and the trial court’s award of compensatory and punitive damages to plaintiffs as a result of their exposure to NORM while employed by ITCO.
AFFIRMED
DYSART, J., concurs in part, dissents in part.
BONIN, J., concurs in part and dissents in part for the reasons assigned by DYSART, J.

. The eight plaintiffs appealing are Timothy Crowley, John Gros, Earl Williams, Alan Williams, Eliot Williams, Ronald Williams, Jeffrey Liberta, and Ronald Schwary.

. The radioactive scale removed from the pipes consists of radium — 226, radium — 228, and their daughter products. To the extent that radium is found on sites such as this one, it is naturally occurring and may be technologically enhanced. It is sometimes referred to as Technologically Enhanced Naturally Occurring Radioactive Material ("TENORM”), which is defined as "natural sources of radiation which would not normally appear without some technological activity not expressly designed to produce radiation.” See, Grefer v. Alpha Technical, 02-1237 (La.App. 4 Cir. 3/31/05), 901 So.2d 1117, 1128, writ denied, 05-1590 (La.3/31/06), 925 So.2d 1248 and writ denied, 05-1259 (La.3/31/06), 925 So.2d 1248 and cert. granted, judgment vacated sub nom., Exxon Mobil Corp. v. Grefer, 549 U.S. 1249, 127 S.Ct. 1371, 167 L.Ed.2d 156 (2007).

.Plaintiffs' tenures at ITCO were as follows: John Gros III, 1982-1992; Timothy Crowley, 1977-1986; Ronald Schwary, 1981-1985; Jeffrey Liberta, 1981-1986; Eliot Williams, 1983-1988; Earl Williams, 1984-1986; Alan Williams, 1984-1992; and Ronald Williams, 1984-1991.

. Former La. Civ.Code art. 2315.3, effective September 3, 1984, allowed exemplary damages in tort cases "if it is proved that plaintiff’s injuries were caused by the defendant’s wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.” See Acts 1984, No. 335 (enacting former art. 2315.1, renumbered 2315.3 by the Louisiana State Law Institute). Former La. Civ.Code art. 2315.3 was repealed effective April 16, 1996. See Acts 1996, 1st Ex.Sess., No. 2.

. The Lester IHOP case went to jury trial in early 2010, resulting in a jury verdict awarding damages for increased risk of cancer but *772 denying plaintiffs’ claims for medical monitoring and punitive damages. In May 2012, the Louisiana Fifth Circuit affirmed that judgment. Lester v. Exxon Mobil Corp., 10-743 (La.App. 5 Cir. 5/31/12), 102 So.3d 148. The Louisiana Supreme Court denied the application on April 19, 2013. Lester v. Exxon Mobil Corp., 2012-2202 (La.4/19/13), 111 So.3d 1028.

. The $1.5 million was after the 40% comparative fault reduction.

. The six plaintiffs awarded $50,000.00 for fear of contracting cancer are Timothy Crowley, Jeffrey Liberta, Eliot Williams, Ronald Williams, John Gros, and Ronald Schwary.

_ 8. , , . , , c The two plaintiffs awarded $40,000.00 for C r 7 .1 tear of contracting cancer are Alan Williams and Earl Williams.

. Rem is the standard unit of measurement for quantifying the ionization energy and the tissue in the body. See James R. Cox, Naturally Occurring Radioactive Materials in the Oil Field: Changing the NORM, 67 Tul. L.R. 1197 (1993), at 1202.

. The five plaintiffs awarded damages for medical monitoring are Timothy Crowley, Jeffrey Liberta, Alan Williams, Eliot Williams, and Ronald Williams.

. "Hemoccult” is the trademark for a particular test for blood in the stool.