# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2023

Lyle W. Cayce
Clerk

————————

No. 22-30526

————————

Ervin Jack, Jr.,

*Plaintiff—Appellant*,

*versus*

Evonik Corporation, *successor in interest to* Evonik Materials Corporation and Tomah Reserve Incorporated, *formerly known as* Air Products Performance Manufacturing, Incorporated, *formerly known as* Versum Materials Performance Manufacturing, Incorporated; Shell Oil Company,

*Defendants—Appellees*.

————————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-1520

————————————————————————

Before Higginbotham, Smith, and Engelhardt, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

For decades, a facility has allegedly emitted dangerous levels of a chemical called Ethylene Oxide ("EtO"). The dangerous properties of the chemical were not widely known outside the scientific community, so it was not until a local law firm began advertising potential lawsuits that several of the neighboring residents became concerned that the diagnoses of cancer that

No. 22-30526

they or their deceased relatives had received resulted from the emissions. Fourteen plaintiffs eventually sued. The case was severed, and the instant case is the first to reach this court.

## I.

Ervin Jack, Jr., sued Evonik Corporation, Shell Oil Company, and four site managers for damages caused by the emission of EtO from a petrochemical manufacturing facility ("the Facility") in Reserve, Louisiana.[1] Jack alleges the following facts:

EtO is a colorless and odorless gas. The Facility uses EtO in its processes and emits levels of it into the air. It has emitted EtO for decades at levels harmful to humans and, at least as of at the time of the First Amended Complaint, continues to do so. The residents of the surrounding area were not informed that the plant was emitting EtO until approximately 2020, nor were they aware that EtO was harmful.

Jack's house is located 2.7 miles from the Facility. He and his late wife, Leander Jack, moved into the house in the 1970s. In 2000, Leander died of breast cancer, which Jack did not attribute to the Facility at the time. Neither Jack nor his wife had any upper-level education in chemistry and "did not know how to research information related to operation of the [F]acility even if they wanted to do so."

Jack alleges that he first learned of the Facility's emission of EtO and

---

[1] Evonik Corporation currently operates the Facility. According to Jack, Evonik Materials Corporation operated it from 2017 to 2019, Versum Materials Performance Manufacturing, Inc., operated it in 2016, Air Products Performance Manufacturing, Incorporated, operated it from 2007 to 2016, and Tomah Reserve Incorporated operated it from 1999 to 2007. Because Evonik Corporation is the successor in interest to the non-Shell corporations, we refer to them collectively as "Evonik." Shell was the owner-operator of the Facility before Evonik, from 1991 to 1999.

2

EtO's dangerous properties through an April 2020 mailer from Voorhies Law Firm, advising that he may have legal rights against the Facility. He sued in Louisiana state court within that year. Also that same year, the EPA's Office of Inspector General issued a "Management Alert" asking the EPA to inform residents living near facilities that emitted EtO of the EtO emissions and the residents' increased risks of developing cancer from exposure therefrom. Such notification did not occur until August 2021, when the EPA organized a public outreach meeting with the Louisiana Department of Environmental Quality ("LDEQ") to warn the residents of their increased risk of cancer from the Facility.

According to Jack's complaint, chemical companies first became broadly aware of EtO's harmful properties in 1977 when the National Institute of Occupational Safety and Health recommended that EtO be considered mutagenic (i.e., capable of causing gene mutations) and carcinogenic. EtO was declared a human carcinogen by California in 1987, by the World Health Organization in 1994, by the United States Department of Health and Human Services in 2000, by the United States National Toxicology Program in 2002, and by the EPA in 2007. In 2004, the National Institute identified EtO emissions as linked to breast cancer mortality in women. In 2016, the EPA increased the cancer risk for EtO to a level 30 times more carcinogenic than previously thought, stating that any exposure to EtO creates a risk of cancer. In 2014, the National Air Toxics Assessment found that the residents surrounding the facility have some of the highest risks of cancer from EtO exposure in the United States, with a risk up to eight times what the EPA considers acceptable.

The results of the National Air Toxics Assessment were published in 2018. During these approximately 40 years, no efforts were made by either the Facility or any governmental agency to inform the surrounding residents of the Facility's EtO emissions or their harmful quality.

By the time that the Voorhies Law Firm sent its mailers, in 2020, advising residents of their potential legal rights against the Facility, much of the alleged damage to Jack, his wife, and the thirteen other plaintiffs who joined the original suit had already been done. Each of the plaintiffs lived near the Facility and had either been diagnosed with cancer or had a spouse die of cancer. Together, they sued Evonik and Shell in Louisiana state court.

Plaintiffs joined four employees of Evonik who were Louisiana residents ("the Louisiana defendants"), claiming that they were also personally liable. The plaintiffs claimed that all the defendants "have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding the facility in order to maximize their profits without ever informing [the residents], or the rest of the surrounding community, of the life-threatening effects of the facility's EtO emissions."[2]

Defendants removed the case to federal district court. They contended that the Louisiana defendants were improperly joined, rendering the properly joined parties completely diverse and giving the federal district

---

[2] The case centers on the theory that although the facility was not emitting levels higher than was legally allowed, the levels were still higher than what was considered "safe" under EPA guidelines. Separately, Jack alleges that the plant was emitting "fugitive" emissions (emissions coming from "undetected and unrepaired faulty equipment, and other negligence"). He asserts that in 2012 and 2013, nearly 1,950 pounds of EtO were released via such fugitive emissions, which is roughly the same amount as the "planned" emissions. He maintains that, following "government scrutiny and pressure," the facility reduced unplanned fugitive emissions by 92% from 2014 to 2020, which reduced its overall emissions by 50%.

Jack contends that the amount of emissions is still higher than EPA guidelines dictate is safe. Jack sues over negligence related to both "controlling planned EtO emissions" and "unplanned fugitive emissions." Importantly, however, at no point does he allege that the plaintiffs fraudulently concealed the amount of planned emissions from the LDEQ.

No. 22-30526

court diversity jurisdiction.[3] The district court agreed, denied the plaintiffs' motion to remand, and dismissed the claims against the four employees.

Shell and Evonik moved to dismiss plaintiffs' remaining claims for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The court granted Shell's motion to dismiss and partially granted Evonik's motion. The court then severed the case into "fourteen distinct civil actions, each with one plaintiff," which were then "randomly allotted to other sections" (meaning to other judges) of that court. The plaintiffs were given leave to file amended complaints in each individual case, subject to some restrictions.

Jack filed his First Amended Complaint in June 2022, suing for "[s]urvival damages for the pain and suffering of Mrs. Jack before her death," "[w]rongful death damages arising from Mrs. Jack's death," and "[d]amages for the fear and increased likelihood of development of cancer and other fatal and debilitating diseases." The district court granted Shell's and Evonik's motions to dismiss. The court concluded that all claims predicated on Mrs. Jack's death were time-barred and that Jack had not properly pleaded damages for the claims based on his own fear of cancer.

Jack appeals. He first contests the dismissal of the Louisiana defendants and requests remand to state court. He next contends that the claims based on Mrs. Jack's death were not time-barred and that the district court should have given him leave to amend before dismissing his claims.

II.

This is a case in diversity, so we apply the substantive law of Louisiana

---

[3] Neither Evonik nor Shell is considered a citizen of Louisiana—Evonik is alleged to be "a corporation organized under the laws of Alabama with its principal place of business in New Jersey," and Shell is "a corporation organized under the laws of Delaware with its principal place of business in [Texas]."

No. 22-30526

and the procedural rules of the federal courts.[4]  Statutes of limitations and time bars are considered substantive in this context,[5]  so we apply Louisiana law.

## III.

We begin, as we must, by assuring ourselves of federal court jurisdiction. *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990). Jack contends that the district court's finding of improper joinder was error, meaning that that court did not have subject matter jurisdiction.  We disagree—Jack has "no possibility of recovery" against the Louisiana defendants, so this court properly retains jurisdiction.  *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc).

Jack joined four employees of Evonik, each of whom is a Louisiana resident who has been a site manager of the Facility.  Because each employee is a citizen of Louisiana, their presence destroys complete diversity.  Jurisdiction thus depends on whether Jack has plausibly pleaded a claim against the four Louisiana defendants.[6]  On appeal, Jack contends that his claims against them for negligence and battery should have survived.  But we agree with the district court—though "[t]he burden of persuasion placed upon those who cry [improper] joinder is indeed a heavy one," defendants have met it.[7] Because Jack does not have a plausible cause of action against the Louisiana

---

[4] *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991); *see also Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1047 (5th Cir. 1990) (per curiam).

[5] *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 110–11 (1945).

[6] The complaint against the original defendants was filed by all plaintiffs jointly, but the case was severed, and Jack is plaintiff for this appeal.  We therefore look to the original pleadings.

[7] *Ford v. Elsbury*, 32 F.3d 931, 935 (5th Cir. 1994) (internal quotations removed).

defendants, their dismissal was proper, and there is jurisdiction.

We review motions to remand for lack of subject matter jurisdiction predicated on improper joinder *de novo*. *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 401 (5th Cir. 2013). Our review generally mimics the familiar "Rule 12(b)(6)-type analysis." *Smallwood*, 385 F.3d at 573. As with a motion to dismiss, courts ask whether, construing all facts in favor of the plaintiff, he has plausibly pleaded a cause of action. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). And, similarly, a defendant has the heavy burden to show "that there is no possibility of recovery by the plaintiff against an in-state defendant." *Smallwood*, 385 F.3d at 573.

If the court determines that the complaint has "misstated or omitted discrete facts that would determine the propriety of joinder," it has the discretion to "pierce the pleadings and conduct a summary inquiry" to determine whether a cause of action could exist. *Id.* The power is limited—"[d]iscovery by the parties should not be allowed except on a tight judicial tether," and the process "should not entail substantial hearings." *Id.* at 574. It "is appropriate only to identify the presence of discrete and undisputed facts that would preclude [the] plaintiff's recovery against the in-state defendant." *Id.* at 573–74. That said, "the decision regarding the procedure necessary in a given case must lie within the discretion of the trial court." *Id.* at 573.

*Negligence*

Jack's first claim against the Louisiana defendants is for negligence. He alleges that they knew or should have known of the harms of EtO, that they were in a position either to stop the amount of emissions or, at least, to warn the surrounding community, and that they were negligent in their failure to do so.

The district court pierced the pleadings to examine affidavits from several of the site managers regarding their roles at the facility, held that there

was no possibility of recovery under Louisiana law, and dismissed the claim. We agree: Jack has no possibility of recovery against the Louisiana defendants.

Specifically, Jack has not plausibly pleaded a duty that the Louisiana defendants violated. Jack's negligence claim stems from Article 2315 of the Louisiana Civil Code, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[8] There are five elements to a negligence claim: duty, breach, cause in fact, legal cause, and damages. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632–33 (La. 2006). As for duty, the plaintiff must establish that the defendant had "a legal duty [to the plaintiff] to protect against the particular risk involved." *Hill v. Lundin & Assocs., Inc.*, 256 So. 2d 620, 622 (La. 1972) (collecting authorities). "Whether a duty is owed is a question of law" for which the court must consider "the unique facts and circumstances presented." *Lemann*, 923 So. 2d at 633.

By engaging in the emissions of EtO, the Facility had a duty to the surrounding residents to protect them from an unreasonable risk of harm. *See, e.g.*, *Garrett v. AEP River Operations, LLC*, Civ. No. 15-5562, 2016 WL 945056, at *2 (E.D. La. Mar. 14, 2016). But to hold the Louisiana defendants personally liable, Jack must plausibly plead that they personally had a legal duty to him. He provides two theories of duty: That the defendants acted negligently in their failure to (1) regulate the amount of EtO emissions coming from the plant to a safe level or (2) warn the residents of the risk of EtO emissions coming from the plant. But if defendants did not have a personal duty to undertake either of these actions, then they cannot be held

---

[8] Also, under Article 2316 of the Louisiana Civil Code, "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

personally liable to Jack.

Jack posits that the duty was delegated to the Louisiana defendants by the employer. The Louisiana Supreme Court allows for such a theory of duty delegation in limited situations. In *Canter v. Koehring Co.*, 283 So. 2d 716 (La. 1973), the court held that an employee can be held personally liable to a third party when

> 1. The principal or employer owes a duty of care to the third person . . . breach of which has caused the damage for which recovery is sought.
>
> 2. This duty is delegated by the principal or employer to the defendant.
>
> 3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances—whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
>
> 4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages.

*Id.* at 721–22 (collecting cases).

Crucially, the delegated duty must be the duty that the plaintiff alleges was breached. Without evidence of that delegation, there can be no liability.

No. 22-30526

So Jack must show that the Facility specifically delegated to the Louisiana defendants the duty to protect the surrounding residents from unsafe levels of EtO or the duty to regulate the emissions of EtO to a safe level. He cannot.

Each Louisiana defendant served as a site manager of the Facility during the time that allegedly harmful amounts of EtO were emitted. Additionally, Jack alleges that each manager was designated to the LDEQ as a Permit Responsible Official ("PRO"), which required the Louisiana defendants to certify the Facility's permitted operations and emissions of gases such as EtO. Jack posits that those two responsibilities, taken together, allow us to assume that (1) the Louisiana defendants were delegated "the duty to ensure that the operations of the [F]acility did not endanger the neighboring community through unsafe operations or dangerous levels of emissions"; (2) had the authority to "implement changes to emissions controls and systems necessary to reduce dangerous emissions of EtO"; (3) had the authority "to take steps to protect the community surrounding the [F]acility"; and (4) generally had direct responsibility for EtO emissions.

The Louisiana defendants flatly deny these assumptions, and three have provided affidavits.[9] Each claims that his responsibility (with respect to EtO) was only to report accurately what was emitted and that he was never delegated any "plant modification, inspection or maintenance activities" or any duty to protect surrounding residents. In response, Jack contends that in this posture, we must construe all assumptions and inferences in his favor. That is correct, but in the face of the defendants' uncontroverted evidence, Jack's proposed inferences are insufficient.

---

[9] One of the Louisiana defendants appears never to have been served and did not file an affidavit; regardless, Jack's allegations against him are identical to those against the other three and are contingent on the precise job descriptions the others had, and so, like the district court, we extend our analysis to him equally.

Jack asks us to assume that an individual who was responsible for managing the Facility and certifying the amount of emissions to the state was *specifically and personally delegated* the responsibility (1) to research the harmful effects of EtO above and beyond what was required by the state, (2) to hold a facility he is employed by to higher standards than those that were set by his employer and the state's environmental department, and, most illogically, (3) to *change the plant's operations* to match the employee's researched, personal preferences. That argument lacks merit. Jack contends that *Davis v. Omega Refining, LLC,* No. 15-518, 2015 WL 3650832 (E.D. La. June 11, 2015), supports his claim. Jack is wrong—in fact, *Davis* highlights his misconception of duty.

*Davis* involved a toxic-tort claim arising from the operation of an oil recycling plant. The plaintiffs, residents of the surrounding area, alleged that the facility had violated its hourly permit emissions limits, concealed and misrepresented information to the LDEQ, neglected to disclose an un-permitted point-source altogether, and failed to prevent plant breakdowns. The plaintiffs joined defendant Stacey Lucas, the plant manager, who provided deposition testimony that appears to have been very similar in substance to the affidavits submitted by the instant Louisiana defendants. Lucas was also a PRO with the authority to certify emissions and testified that "she was a liaison for the plant with the [LDEQ]," but that she was not responsible for "inspecting, maintaining, repairing, or operating any equipment in the plant." *Id.* at *4. Jack cites the case favorably because the court found that Lucas could be properly joined. *See id.* at *5. But plaintiffs miss the point of *Davis.*

*Davis* alleged liability based on a breach of the duty to report emissions levels accurately —the suit alleged that the emissions levels were fraudulently reported and that the fraudulent reporting was the cause of plaintiffs' injuries. Lucas was specifically delegated the responsibility to report. *Id.*

That duty—and breach—match, so the plaintiffs had a plausible cause of action against Lucas.

In Jack's case, the plant managers were delegated the responsibility to keep the site running and to accurately report the amount of emissions to the LDEQ.  The suit alleges that even though the amount of emissions was accurately reported, the EtO level was higher than was safe.  That alleged breach does not match the plant managers' duty.  Because Jack has not plausibly pleaded a duty owed to him by the Louisiana defendants, his negligence claim has "no possibility of recovery."  *Smallwood*, 385 F.3d at 573.

Taking another tack, Jack contends that we cannot consider the affidavits of the site managers and must rely solely on the pleadings.  That is inaccurate.  Jack's argument takes two forms: first, that we cannot consider the affidavits at all because what duty was delegated is not a "discrete" fact, and, second, that even if we can consider the affidavits, we should not be persuaded by them, because they are not "undisputed."  *See Smallwood*, 385 F.3d at 573.  We take the contentions in turn.

First, Jack alleges that whether the defendants worked at the plant would be a discrete fact, but what duties they were delegated is not.  He then cites four cases in which courts pierced the pleadings on allegedly more "discrete" issues.[10]  But, strangely, Jack ignores the plethora of cases cited in *his own brief* in which the court pierced the pleadings to examine affidavits on

_____

[10] *Bureau v. BASF Corp.*, Civ. Ac. No. 21-324, 2022 WL 807372, at *5 (M.D. La. Jan. 3, 2022) (piercing the pleadings to determine whether the defendant was a plant manager); *Sanders v. Nexion Health at Minden, Inc.*, No. 18-CV-0263, 2018 WL 10517162, at *4 (W.D. La. May 29, 2018) (same to determine whether the defendant purchased a certain company); *Finkelman v. Liberty Mut. Fire Ins. Co*, Civ. Ac. No. H-09-3855, 2010 WL 11582933, at *7–8 (S.D. Tex. Feb. 4, 2010) (whether the defendant was the individual assigned to plaintiff's claim).

exactly the issue of delegated duty under *Canter*.[11]  And in the face of those many examples—including a published opinion from the Fifth Circuit—Jack has failed to provide any case in which the court declined to pierce the pleadings in a similar situation.  We agree with the cases that Jack forgets:  What duties an employee was delegated by his employer can be a discrete fact that a court may properly pierce the pleadings to examine.

Jack next contends that we cannot consider the affidavits because he disputes the allegations.  Specifically, he claims that we should ignore the defendants' statements that they were never delegated the duties that Jack claims they were because Jack has said the opposite.  We disagree.  Once the court decides to pierce the pleadings, it embarks on a summary inquiry, not a Rule 12(b)(6) analysis.[12]  All the cases that Jack cites confirm that.

Consider *Ford v. Elsbury*.  There, the plaintiff brought a negligence claim against a fertilizer plant for injuries caused by the urea reactor's explosion and joined the plant manager, Ernie Elsbury, as a defendant.  32 F.3d at 933.  Elsbury alleged, by affidavit, that he had no duty to ensure the "safety, maintenance and operations" of the urea reactor because that duty had been delegated to "properly trained and qualified supervisors."  *Id.*

---

[11] Every one of the following cases is cited in Jack's brief and involves a court's piercing the pleadings to examine an affidavit or other evidence proffered by the employee regarding whether a given duty was delegated for purposes of *Canter* liability: *Davis*, 2015 WL 3650832, at *4; *Bryant v. Exxon Mobil Corp.*, Civ. Ac. No. 10-532, 2011 WL 3163147, at *5 (M.D. La. May 19, 2011), *report and recommendation adopted*, 2011 WL 3207817 (M.D. La. July 26, 2011); *Caire v. Murphy Oil USA, Inc.*, Civ. Ac. No. 13-4765, 2013 WL 5350615, at *3 (E.D. La. Sept. 13, 2013); *Ford*, 32 F.3d at 938–39; *Gulotta v. Dow Chem. Co.*, Civ. Ac. No. 05-370, 2006 WL 8433368, at *4–5 (M.D. La. Feb. 9, 2006); *Anderson v. Ga. Gulf Lake Charles, LLC*, 342 F. App'x 911, 917–18 (5th Cir. 2009); *Hayden v. Phillips Petroleum Co.*, 788 F. Supp. 285, 287 (E.D. La. Mar. 5, 1992); *Garrett*, 2016 WL 945056, at *3.

[12] *See Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., LLC*, 818 F.3d 193, 207 (5th Cir. 2016) ("Certainly a court *may* choose to use either one of these two analyses, but it *must* use one and only one of them, not neither or both").

at 936, 938. The district court pierced the pleadings to consider the affidavits but found that Elsbury could be properly joined because plaintiffs submitted direct evidence contradicting Elsbury's statement.[13]

Similarly, in *Garrett*, the plaintiffs sued the operators of a shipyard because of damages from toxic fumes and "paint and sandblasting residue." 2016 WL 945056, at *1. They alleged that the workers were not using proper protective coverings. They joined Stephen Barrios, the shipyard supervisor, as a defendant, asserting that he "owed plaintiffs a duty to ensure that the shipyard's operations were conducted safely and would not expose plaintiffs to an unreasonable risk of harm." *Id.* at *2. Barrios submitted a sworn declaration stating that he had no such duty. But the plaintiffs submitted an email exchange between Barrios and the LDEQ in which Barrios stated that he did have that duty. On that basis, the court found a factual dispute and ruled that Barrios could be properly joined.

In both of those cases, the fact was considered "disputed" because there was evidence pointing both ways. That did not occur here—Jack has done no more than provide the defendants' general job descriptions and asked us to assume that because they had one duty, they must have had another. That we cannot do. Where the evidence supports one theory of events, we are entitled to adopt that theory as true in this summary inves-

---

[13] Plaintiffs submitted an affidavit of an employee who alleged that he had known "the reactor was leaking, . . . complained to Elsbury about having to work in an unsafe area, and that Elsbury told him: 'Sometimes you have to overlook safety to get the job done.'" *Ford*, 32 F.3d at 939. They also submitted an affidavit of an employee who "stated that a leak was found in May of 1992, that his supervisor ordered the plant slowed down, and that the urea superintendent went into Elsbury's office and then returned to direct the plant back to full production." *Id.* Elsbury also "admitted that he had authority to shut the plant down for safety reasons" and "that he would expect the urea superintendent to report any threat to the safety of employees and others." *Id.*

tigation, even if Jack states that it is not.

For example, in *Anderson*, the plaintiffs sued for personal injuries from a plant explosion. They sued several employee-defendants, contending that the company "delegated responsibility for operations, maintenance, and emergency response activities to each of the Employee-Defendants personally, and that this delegation created duties of care that were owed individually by the Employee-Defendants to the Plaintiffs." 342 F. App'x at 913–14. Again, the employees "submitted affidavits specifically denying that they intentionally released toxic chemicals, and stating that various maintenance, repair, and safety responsibilities were general administrative responsibilities that were properly delegated to qualified individuals within each department." *Id.* at 916. There, as here, the plaintiffs thought that the defendants had a larger duty, but because the plaintiffs "failed to submit any contradictory evidence," the case against the defendants was dismissed. *Id.*

In short, Jack has provided no direct evidence to contradict the Louisiana defendants' sworn testimony that they had no duty to protect the safety of residents surrounding the plant or research relevant safety standards for EtO emissions. The district court properly pierced the pleadings to consider the affidavits, and, finding the testimony undisputed, properly dismissed the negligence claims against those defendants.

*Battery*

Jack's battery claims against the Louisiana defendants also fail. Louisiana law describes battery as "harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987) (collecting authorities). That act must be intentional. *Id.* In his original complaint, Jack framed his battery claim on the theory that the Louisiana defendants intended for the Facility to emit EtO and that they knew it would harm the residents. In his merits brief,

he describes the tort as a failure to protect the residents. Because the Facility, not the Louisiana defendants, was responsible for the emissions of EtO, Jack's claim is best read as alleging a theory of "battery-by-omission," or failure to stop a harm.

The district court noted that there are no Louisiana cases "accepting plaintiffs' theory of battery-by-omission" and that "other states have explicitly held that battery requires an affirmative act; inaction or omissions do not suffice." It concluded that Louisiana law does not recognize battery-by-omission. Jack challenges this on appeal, citing a handful of cases that he claims support his theory.[14] But those cases are inapposite: They support the theory that *the company* that is directly responsible for emitting toxins can be found liable for battery.

Jack argues that these decisions do not "involve[] the type of 'affirmative act' the district court originally indicated is necessary to state a claim. Rather, [they] involve[] allegations of a knowing exposure, an understanding on the part of the defendant of a likely substantial harm, and the failure of the defendant to protect the plaintiff." True. But Jack omits the crucial difference between those cases and his—in each of his cited cases, the plaintiffs sued the *facility*, which was directly responsible for affirmatively emitting the toxins. Jack's argument is meritless because failure to stop someone else's emission of a toxin is not battery; it would be battery-by-omission. We agree with the district court—we do not understand Louisiana law to provide liability for battery-by-omission. Thus, Jack's battery claims fail.

---

[14] *See Swope v. Columbian Chems. Co.,* 281 F.3d 185, 195–96 (5th Cir. 2002); *Mulkey v. Century Indemnity Co.*, 2017 WL 1378234, *1–3 (La. App. 1 Cir. 4/12/17); *Nase v. Teco Energy, Inc.,* 347 F. Supp. 2d 313 (E.D. La. 2004). *Nase* does involve an intentional tort claim against an employee, but it is a claim by one employee against his "safety manager," and is inapposite.

No. 22-30526

In conclusion, Jack cannot establish a plausible cause of action against the non-diverse defendants, and the district court was correct that they were improperly joined.

## IV.

Satisfied with our jurisdiction, we turn to the merits of Jack's claims against Shell and Evonik. After the case was severed and Jack filed his individual complaint with the district court, Shell and Evonik again moved to dismiss the remainder of Jack's claims. The district court granted the motion and dismissed the case with prejudice. On appeal, Jack contests two of the district court's holdings: First, that the claims predicated on his wife's death were time-barred, and second, that Jack should be denied leave to amend the claims based on his own emotional harm. We take each in turn.

## A.

Jack's wife, Leander, died of breast cancer in 2000. The district court dismissed the claims predicated on her death as time-barred.

We review a district court's grant of a motion to dismiss *de novo*.[15] To survive a motion to dismiss, the plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[16] At this stage, "[w]e accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff."[17] But "conclusory allegations, unwarranted factual

---

[15] *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011).

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[17] *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021) (citing *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020)).

17

inferences, or legal conclusions" are not accepted as true.[18]

The prescriptive period for Jack's survival action and wrongful death claims is one year. *See* LA. CIV. CODE ANN. art. 2315.1(A) (survival actions); 2315.2(B) (wrongful death). Jack sued in 2021, but Leander died in 2000, and her diagnosis occurred before that. Therefore, her diagnosis predated the April 26, 2020 cutoff required to render this suit timely.

Jack counters that *contra non valentem*, a fixture of Louisiana law that can prevent the running of prescriptive periods, renders his suit timely. Specifically, he claims that he had no way of knowing that (1) the Facility was emitting EtO, (2) EtO is carcinogenic, and (3) those emissions were a potential cause of his wife's death until he was made aware by the Voorhies Law Firm's mailing. *Contra non valentem* pauses prescriptive periods "where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant."[19] "The question is whether, in light of plaintiff's own information and the diagnoses he received, the plaintiff was *reasonable* to delay in filing suit."[20] The burden is on Jack to show that *contra non valentem* applies.[21]

*Contra non valentem* ends (and prescription commences) when the reasonable person has actual or constructive knowledge of the facts making him a victim of a tort. "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry.

---

[18] *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

[19] *Tenorio v. Exxon Mobil Corp.*, 14-814, p. 9 (La. App. 5 Cir. 4/15/15), 170 So. 3d 269, 275.

[20] *Guerin v. Travelers Indem. Co.*, 2019-0861, p. 6 (La. App. 1 Cir. 2/21/20), 296 So. 3d 625, 629; *see also Cole v. Celotex Corp.*, 620 So. 2d 1154, 1157 (La. 1993).

[21] *Tenorio*, 170 So. 3d at 273.

Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead."[22]  What is reasonable is informed by the plaintiff's own attributes and circumstances:  We ask whether the plaintiff's action or inaction was reasonable "in light of his education, intelligence, and the nature of the defendant's conduct."[23]  Further, "[a] party's pleadings are to be so construed as to do substantial justice."[24]

The parties posit that there are two questions relevant to this inquiry:  First, was it reasonable for Jack to fail to ask what caused his wife's breast cancer, and, second, if Jack had asked, would a reasonable inquiry have led to the facts that made him the victim of a tort?

The district court does not seem to have directly considered whether Jack could have discovered the tortious activity if he had inquired—instead, the court held that a reasonable person would have asked what caused the breast cancer, and thus, regardless of where the inquiry would have led, Jack was unreasonable and *contra non valentem* did not apply.  But whether that theory—that prescription begins when one unreasonably fails to investigate, despite whether the tortious activity is actually knowable—is correct under Louisiana law is a matter of first impression.

In fact, the many district court judges considering the claims of plaintiffs who were severed in the instant case have fractured on that precise issue.[25]  Most of the cases interpreting *contra non valentem* can be read either

_____

[22] *Campo v. Correa*, 2001–2707, pp. 11–12 (La. 6/21/02), 828 So. 2d 502, 510–11.

[23] *Marin v. Exxon Mobil Corp.*, 2009-2368, p. 15 (La. 10/19/10), 48 So. 3d 234, 246; *see also Griffin v. Kinberger,* 507 So. 2d 821, 823–24 (La. 1987).

[24] *Henson v. St. Paul Fire & Marine Ins. Co.*, 363 So. 2d 711, 713 (La. 1978) (collecting authorities) (applying *contra non valentem*).

[25] *Compare Fortado v. Evonik Corp.*, Civ. No. 22-1518, 2022 WL 4448230, at *4–8 (E.D. La. Sept. 23, 2022) (Milazzo, J.) (applying *contra non valentem*); *Jones v. Evonik Corp.*,

way—for example, *Jenkins v. Bristol-Myers Squibb Co.* seems to suggest that the entirety of *contra non valentem* is based on the plaintiff's actions, but later clarifies that "[t]olling pursuant to contra non valentem ends, and the prescriptive period begins, on 'the date the injured party discovers or should have discovered the facts upon which his cause of action is based.'" 689 F. App'x 793, 796 (5th Cir. 2017) (per curiam) (quoting *Eastin v. Entergy Corp.*, 2003-1030, p. 7 (La. 02/06/04), 865 So. 2d 49, 55). Similarly, *Cole* states that "[w]hen prescription begins to run depends on the reasonableness of the plaintiff's action or inaction," 620 So. 2d at 1157 (quoting *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)), but also that "*contra non valentem* [applies] where the cause of action is not known or reasonably knowable by the plaintiff," *id.* at 1156. As the district court held in *Fortado* (another one of the severed cases), the decisions that most strongly support the theory that prescription commences when a plaintiff fails to inquire following a diagnosis are all instances in which "the court found that an inquiry following a diagnosis would *not* have been futile. Accordingly, *those* diagnoses served as constructive notice, but the courts said nothing of them necessarily serving as notice simply by virtue of being diagnoses."[26]

We need not answer what would have happened if Jack had acted

---

620 F. Supp. 3d 508, 516–19 (E.D. La. 2022) (Africk, J.) (applying *contra non valentem)*; *LeBouef v. Evonik Corp.*, 620 F. Supp. 3d 463, 467–70 (E.D. La. 2022) (Barbier, J.) (applying *contra non valentem* because plaintiff asked); *Lumar v. Evonik Corp.*, Civ. No. 22-1524, 2022 WL 3924299, at *2 (E.D. La. Aug. 31, 2022) (Zainey, J.) (applying *contra non valentem*), *with Joseph v. Evonik Corp.*, Civ. No. 22-1530, 2022 WL 16712888, at *4–7 (E.D. La. Nov. 4, 2022) (Vance, J.) (denying *contra non valentem*); *Villa v. Evonik Corp.*, Civ. No. 22-1529, 2022 WL 3285111, at *2 (E.D. La. Aug. 11, 2022) (Ashe, J.) (denying *contra non valentem*); *Moore v. Evonik Corp.*, Civ. No. 22-1525, 2022 WL 3280123, at *2 (E.D. La. Aug 11, 2022) (Ashe, J.) (denying *contra non valentem*).

[26] 2022 WL 4448230, at *7 (citing *Tenorio*, 170 So. 3d 269; *Lennie v. Exxon Mobile Corp.*, 17-204 (La. App. 5 Cir. 6/27/18) 251 So. 3d 637; *Guerin*, 296 So. 3d 625; *Butler v. Denka Performance Elastomer, LLC*, 16 F.4th 427, 439–40 (5th Cir. 2021)).

unreasonably, however, because we hold that Jack did not act unreasonably when he failed to inquire further into the cause of his wife's breast cancer.[27] The question is whether a reasonable man with Jack's education and experience should have suspected —without any indication to the contrary—that the cause was something out of the ordinary.  Under the specific facts of this case, the answer is no.

The doctrine of *contra non valentem* does not allow us to put ourselves, with the benefit of all our information and hindsight, into Jack's shoes.  Nor does it permit us to opine as to whether a fictional and infallible "reasonable person" would have asked follow-up questions.  Jack, who had no connections to the plant, had lived in the same small town all his life, was computer illiterate, and had no medical training, cannot be expected to hunt down answers to a problem when there was absolutely no suggestion, at the time of the diagnosis, that any out-of-the-ordinary problem existed.

Furthermore, breast cancer is an exceedingly common diagnosis.[28] Unlike asbestois or multiple myeloma, it generally has a mundane cause[29] and

---

[27] That said, the most natural reading of *contra non valentem* is that prescription cannot commence until the landscape is such that a reasonable inquiry could have put the plaintiff on actual or constructive notice of the tortious activity.  Under this conception, what the plaintiff actually did is but a red herring:  If the facts are not capable of discovery, then the claim cannot be time-barred.  We find the reasoning of *Jones*, 620 F. App'x at 518, persuasive: "[E]ven if plaintiff's diagnosis triggered a duty to inquire further, the Court can only deem plaintiff to know what a reasonable inquiry would have revealed."

[28] Indeed, the average American woman has a 13% chance of developing breast cancer.  It is the most common cancer in women. *Key Statistics for Breast Cancer*, Am. Cancer Soc'y, https://www.cancer.org/cancer/types/breast-cancer/about/how-common-is-breast-cancer.html (Jan. 12, 2023).

[29] The CDC states that "the main factors that influence your risk [for breast cancer] include being a woman and getting older." *What Are the Risk Factors for Breast Cancer?*, CDC, https://www.cdc.gov/cancer/breast/basic_info/risk_factors.htm (July 25, 2023) . The American Cancer Society lists breast cancer as the most common cancer in women in the United States and as the second leading cause of cancer death in women. *See* Am.

No. 22-30526

is not the kind of diagnosis that puts one on notice of problems in and of itself.[30] And a man who does not work for an allegedly tortious employer cannot be held, with nothing more, to be suspicious of invisible and unknown emissions of surrounding companies or to embark independently on an investigation of the inner workings of an otherwise ordinary plant.[31] We reverse and remand this claim to the district court for further factual development as to when Jack reasonably could have discovered the allegedly tortious cause of his wife's diagnosis and death.[32]

## B.

Next, we reach Jack's assertion of "fear and increased likelihood of development of cancer and other fatal and debilitating diseases" caused by defendants' allegedly negligent emissions of EtO. The district court dismissed those claims (both for negligence and nuisance) per defendants' motions to dismiss and denied Jack leave to amend. But Jack alleges that the district court did not give him proper notice or opportunity to amend. On appeal, Jack challenges only the denial of leave to amend, not the actual dismissal.[33]

––––––––––––––––––––––––

CANCER SOC'Y, *supra* note 28.

[30] In *Cole*, a plaintiff who was an employee of the defendant was diagnosed with pleurisy and early pneumonia in 1955 but was not charged with constructive notice of his asbestos exposure at work until 1979, when he was diagnosed with asbestosis. 620 So. 2d at 1156–58 (La. 1993).

[31] *Cf. Guerin*, 296 So. 3d at 631 (holding that an employee diagnosed with multiple myeloma was on constructive notice at the time of diagnosis); *Tenorio*, 170 So. 3d at 275 (finding the same for an employee diagnosed with throat cancer); *Lennie,* 251 So. 3d at 648 (finding the same for an employee diagnosed with lung cancer).

[32] This conclusion is merely that the diagnosis alone did not put Jack on notice of the tort. We take no position on the ultimate outcome.

[33] Jack does not appeal the holding that neither *contra non valentem* nor the continuing-tort doctrine applies to his claims against Shell; he therefore appeals only the

No. 22-30526

*Negligence*

Under Louisiana law, there are five elements to a negligence claim: duty, breach, causation in fact, causation in law, and damages. *Lemann*, 923 So. 2d at 632–33. Evonik moved to dismiss Jack's negligence claim, alleging that he had failed to plead a duty or breach of a duty. The district court disagreed, citing a sister case to Jack's. *LeBouef*, 620 F. Supp. 3d at 470–74. But the district court did dismiss the claim, holding instead that Jack had failed properly to plead damages. The court then denied leave to amend.

We review denials of leave to amend a complaint for abuse of discretion. *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997). That discretion, however, is bounded by Federal Rule of Civil Procedure 15(a)(2), which provides that "[t]he court should freely give leave [for a party to amend] when justice so requires." "[O]utright refusal to grant the leave without any justifying reason appearing for the denial" is an abuse of discretion.[34] There are five factors for a district court to consider: (1) undue delay; (2) bad faith or dilatory motive on the part of the movant; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by allowing the amendment, and (5) futility of amendment. *Smith v. EMS Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003)). If none of those factors is present, "the leave sought should be 'freely given.'" *Id.* (quoting *Foman*, 371 U.S. at 182).

The district court gave no reason for dismissing Jack's claim with pre-

---

dismissal of those claims against Evonik.

[34] *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Rolf v. City of San Antonio*, 77 F.3d 823, 828–29 (5th Cir. 1996); *Halbert v. City of Sherman*, 33 F.3d 526, 529–30 (5th Cir. 1994); *Conti v. Sanko S.S. Co.*, 912 F.2d 816, 818–19 (5th Cir. 1990).

judice. But we can still affirm if there is a "justifying reason appearing" in the record. *Foman*, 371 U.S. at 182. The defendants contend that Jack has been given three chances to show damages and each time has failed to do so. Thus, they claim, the district court was perfectly in its right to dismiss for *Foman*'s reason number 3: "repeated failure to cure deficiencies by previous amendments." *Smith*, 393 F.3d at 595. But that contention is thwarted by the district court's peculiar dismissal: Jack was not put on notice that the damages element of his pleading was deficient until the very moment it was dismissed.

Jack first filed his complaint in the mass action. The district court dismissed the claim and allowed Jack leave to amend to address "specific facts supporting the application of *contra non valentem*" and "the duty allegedly breached by these defendants, thereby supporting claims for general negligence." The court did not identify any issues with the damages element.

Next, Jack filed his amended complaint. The defendants moved to dismiss again—but nowhere in their motion did they claim that Jack had inadequately pleaded damages. Defendants now claim that Jack's failure, in his response brief, to explain how he could have more specifically pleaded damages indicates that he could not have done so. That reasoning amounts to faulting Jack for not being clairvoyant—why would a party add more detail to an allegation when, despite several motions to dismiss, no one has found it deficient?

Normally, a plaintiff should be afforded at least one chance to remedy all identified flaws in his pleadings. That did not occur, so the dismissal with prejudice was error. Plaintiffs should usually be able to amend at least once, because "fairness requires" it.[35] This is not a situation in which leave to

---

[35] *Century Sur. Co. Blevins*, 799 F.3d 366, 372 (5th Cir. 2015) (citing *Jacquez v.*

amend would have been futile. Before dismissing Jack's claim, the district court held that all elements of his claim—save damages—were plausibly pleaded. Thus, if Jack can plausibly plead damages, his claim should survive a motion to dismiss.

Jack's negligence claim was premised on his "fear and increased likelihood of development of cancer and other fatal and debilitating diseases." Those are purely emotional damages. In Louisiana, plaintiffs can recover for mental anguish alone (without a physical injury) if there are "special situations" that make it especially likely that an ordinary person would experience mental anguish. The plaintiff must show an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious."[36]

Identifying those special circumstances can be difficult. In one state appellate case, the plaintiffs could recover when "the record establishe[d] that all eight of the plaintiffs sustained a lifetime exposure to the various radioactive isotopes in excess of 10 rems and that there [was] no doubt according to the medical experts that a dose in excess of 10 rems results in a risk of developing cancer," and plaintiffs testified to specific mental and physical distress such as rashes and high blood pressure. *Lester v. Exxon Mobil Corp.*, 2012-1709, pp. 11–13 (La. App. 4 Cir. 6/26/13), 120 So. 3d 767, 776–77. The district court, relying on a now-overturned Louisiana appellate decision, summarized some of those circumstances as "[p]roximity to the event,

---

*Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)); *cf. Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 311 (5th Cir. 2014) (stressing the importance of providing notice and an opportunity to be heard to a plaintiff before dismissal).

[36] *Bonette v. Conoco, Inc.*, 2001-2767, p. 23 (La. 1/28/03), 837 So. 2d 1219, 1235 (quoting *Moresi v. State ex rel. Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1096 (La. 1990)).

witnessing injury to others, and contemporaneous reports from reliable sources that danger is real." *See Spencer v. Valero Ref. Meraux, LLC.*, No. 2021-0383, 2022 WL 305319, at *7 (La. App. 4 Cir. 2/2/22).

Since the district court ruled in Jack's case, *Spencer* has been overturned by the Louisiana Supreme Court, which clarified what is needed to make out damages in a negligence claim predicated on pure mental anguish:

> The plaintiff's mental disturbance must be "serious." Evidence of generalized fear or evidence of mere inconvenience is insufficient. Evidence of medical treatment is not required, nor is expert medical testimony; however, a plaintiff bears the burden of presenting sufficient evidence of the nature and extent of the mental anguish suffered that was caused by the defendant's conduct. Whether the mental distress is "serious" is a matter of proof. Finally, we reiterate that these guidelines must be applied with the policy considerations discussed herein.

*Spencer v. Valero Refin. Meraux, L.L.C.*, 2022-00469, p. 16 (La. 1/27/23), 356 So. 3d 936, 950 (citations omitted). There was no need to show "severe, debilitating emotional distress" or that the defendant's conduct was "outrageous," but "public policy considerations require reasonable limits on recovery for negligent infliction of emotional distress." *Id.* at 946. The plaintiffs were not allowed recovery where they had witnessed an explosion, but the explosion had caused no release of "significant levels of chemicals" and no one whom plaintiffs knew was injured. *Id.* at 941, 951.

But Jack experienced both of those things: He knows that he has suffered significant levels of toxic emissions for decades, and his wife died of cancer allegedly caused by those toxins. He has cited numerous studies showing his significantly increased risk of cancer from living within three miles of the Facility for several decades and alleges that his risk is more than eight times what the EPA deems acceptable. A reasonable factfinder could decide that those are special circumstances that establish damages for mental

anguish without physical injury.

Pure mental-anguish cases like these are unique — "no one fact, or lack thereof, necessarily entitles a plaintiff to a recovery, nor does it preclude recovery." *Spencer*, 356 So. 3d at 949. Yet the district court dismissed Jack's claim — without notice or leave to amend — because he "fail[ed] to plead any facts, let alone sufficient facts, about how his fear of cancer and other diseases has manifested itself . . . . Plaintiff has not alleged that he suffers panic attacks, high blood pressure, rashes, or any other manifestations of his fear."

On this record, there is no way to know that Jack could not provide such proof, nor is it clear that the lack of such proof would be legally dispositive. Therefore, it cannot have been a reason to deny Jack leave to amend. None of the other *Foman* factors — undue delay, bad faith or dilatory motive, or undue prejudice to the opposing party — is at issue here. *See* 371 U.S. at 182. The dismissal without leave to amend was thus an abuse of discretion and is vacated.

*Nuisance*

Jack pleaded a nuisance claim under Louisiana's vicinage articles. La. Civ. Code Ann. art. 667. Before the case was severed, defendants moved to dismiss, but unlike as for the negligence claim, the court did not grant the motion. The defendants again moved to dismiss the nuisance claim after the case was severed. At that point, the court did dismiss with prejudice. But as with the negligence claim, there is no evidence of Jack's "repeated failure to cure deficiencies by previous amendments." *Smith*, 393 F.3d at 595. The district court dismissed the claim because Jack failed to show "individualized facts about how the EtO has been a nuisance to him." For similar reasons as above, we disagree that granting leave to amend would necessarily be futile. *See id*. We therefore vacate that denial as well.

\* \* \* \* \*

27

No. 22-30526

The finding of improper joinder is AFFIRMED.  The dismissal of Jack's claims predicated on his wife's death is REVERSED and REMANDED.  The denial of leave to amend the claims predicated on Jack's emotional injuries, as pleaded against Evonik, is VACATED.

This matter is REMANDED for proceedings as required.  We place no limitation on the matters that the conscientious district court may address and decide on remand, and we give no indication of what rulings it should make.